UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHASE INVESTMENT SERVICES CORP., | ) | CV 09-9152 SVW (MANx) |
| | ) | |
| Plaintiff in Interpleader, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAW OFFICES OF JON DIVENS & | ) | FINDINGS OF FACT AND |
| ASSOCIATES, LLC, et al., | ) | CONCLUSIONS OF LAW |
| | ) | |
| Defendants in Interpleader. | ) | JS6 |
| —————————————————————— | ) | |
| | ) | |
| AMEDRAA, LLC, | ) | |
| | ) | |
| Cross-claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAW OFFICES OF JON DIVENS & | ) | |
| ASSOCIATES, LLC; JON DIVENS, | ) | |
| | ) | |
| Cross-defendants. | ) | |
| —————————————————————— | ) | |
| | ) | |
| BETTS AND GAMBLES INVESTMENTS, | ) | |
| INC., and BETTS AND GAMBLES | ) | |
| GLOBAL EQUITIES LLC, | ) | |
| | ) | |
| Cross-claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAW OFFICES OF JON DIVENS & | ) | |
| ASSOCIATES, LLC; JON DIVENS, | ) | |
| | ) | |
| Cross-defendants. | ) | |
| —————————————————————— | ) | |

I.   **INTRODUCTION AND PROCEDURAL BACKGROUND**

Plaintiff-in-Interpleader Chase Investment Services Corp. ("Plaintiff" or "CISC") filed this interpleader action against several Defendants-in-Interpleader that had conflicting claims to the assets in a CISC securities brokerage account, Account No. CM2-303194 ("the Account" or "the CISC Account").  The Account was opened in late July 2009 by Defendant-in-Interpleader Jon Divens ("Divens") on behalf of Defendant-in-Interpleader the Law Offices of Jon Divens & Associates, LLC ("JDA").

Initially, the Account held no assets.  However, after two transfers in September 2009, the Account held securities representing interests from three Collateralized Mortgage Obligations (collectively, "the CMOs").[1]  The securities in the Account included: (1) a CMO designated as the Cobalt CBMS Series 2007-CS Class IO 00.02840 05/15/2046, CUSIP 1907DAG6, with a face value of $1,008,402,393 (hereinafter, "the Cobalt CMO"); (2) a CMO designated as the JPMCC Series 2007-CB19 Class X 00.01240 02/12/2049 MTG SEC, CUSIP 46630VAG7, with a face value of $235,250,000 (hereinafter, "the JPMCC Series CMO"); and (3) a CMO designated as the FNMA Series 2003-W19, Class 1-IO-1 0.33048% 11/25/2043 GTD Remic Pass Thru CTF Whole Loan, CUSIP 31393UA86, with a face value of $305,000,000 (hereinafter, the "FNMA Series CMO").  The three CMOs are interest-only CMOs, which provide the right to receive a portion of the interest payments on the mortgages owned by the CMO.  The CMOs earn interest payments on a monthly basis. While the CMOs were in the CISC Account these interest payments were automatically deposited into the Account.

A.   **The Interpleader Action and Related Crossclaims**

In or about late October 2009, CISC started to receive competing claims to the assets held in the Account.  In response to those claims, CISC froze the Account on November 17, 2009.  On December 14, 2009, CISC instituted this interpleader action naming the following parties who had asserted adverse claims to the assets in the Account: (1) Jon

---

[1] A CMO is a special-purpose entity that owns an underlying pool of mortgages (the collateral) and issues securities to investors that provide defined rights to receive a portion (called a class or a "tranche") of the payments of principal and/or interest on the underlying pool of mortgages owned by the CMO.

Divens, (2) Law Offices of Jon Divens & Associates, (3) Betts and Gambles Investments, Inc. and its affiliate Betts and Gambles Global Equities, LLC, (4) Midwest Royalties LLC, (5) Bryan Stallings, and (6) Amedraa LLC.

In January 2010, Midwest Royalties LLC informed CISC that Midwest Royalties LLC had been mistaken about the assets in the Account and that Midwest Royalties actually did not have any interest in the CMOs. Thus, Midwest Royalties was dismissed from this action on February 5, 2010. (Order, 02/05/10, Docket No. 55.) Also in January 2010, third-party Core Impact Consulting contacted CISC and asserted an interest in the JPMCC Series CMO held in the Account. Thus, CISC amended the Complaint-in-Interpleader on February 5, 2010 to add Core Impact Consulting as a Defendant-in-Interpleader. (Id.)

On January 22, 2010, Defendant-in-Interpleader Amedraa LLC ("Amedraa") answered the Complaint-in-Interpleader and asserted several crossclaims against JDA and Divens. (Docket No. 47.) Amedraa alleged that it was the owner of the FNMA Series CMO and that Amedraa had transferred the FNMA Series CMO to JDA in trust in January 2009 to hold in escrow. Amedraa alleged that JDA failed to return the FNMA Series CMO upon demand in February 2009 and that Divens absconded with the FNMA Series CMO, transferring it to several institutions until eventually it was transferred to the CISC Account. Amedraa sought return of the FNMA Series CMO, as well as the interest payments paid on the FNMA Series CMO while it was in JDA's possession.

Defendants-in-Interpleader Betts and Gambles Investments, Inc. and its affiliate Betts and Gambles Global Equities (collectively, "Betts and Gambles") asserted a similar crossclaim against Divens and JDA on February 12, 2010. (Docket No. 61.) Betts and Gambles alleged that it owned the Cobalt CMO and had transferred it to Divens in February 2009 to hold in escrow for a proposed sale of the Cobalt CMO to a third party. Betts and Gambles alleged that when the sale fell through, they demanded that Divens return the Cobalt CMO but he refused. Betts and Gambles alleged that Divens transferred the Cobalt CMO to several different financial institutions so as to hide it from Betts and Gambles until it finally ended up in the CISC Account. Betts and

Gambles sought return of the Cobalt CMO as well as the interest that had accrued on the Cobalt CMO while it was in Divens's possession.

**B.    Prior Stipulations and Orders**

Throughout the course of this litigation, several of the Defendants-in-Interpleader reached stipulations with Divens, JDA, and CISC regarding the assets in the Account.  On February 2, 2010, the Court approved a Joint Stipulation between Bryan Stallings ("Stallings"), JDA, Divens and CISC, and ordered that a portion of the JPMCC Series CMO owned by Stallings be released from the Account to Stallings.  Stallings was voluntarily dismissed from this action on February 2, 2010.  (Order, Docket No. 51.)

On February 23, 2010, the Court approved a Joint Stipulation between Core Impact Consulting, JDA, Divens and CISC, and ordered that the remaining portion of the JPMCC Series CMO owned by Core Impact Consulting be released from the Account to Core Impact Consulting. (Order, Docket No. 72.)  Core Impact Consulting was voluntarily dismissed from this action on March 8, 2010.  (Docket No. 78.)

On February 23, 2010, the Court approved a Joint Stipulation between Amedraa, JDA, Divens, and CISC, and ordered that the FNMA Series CMO be released from the Account to Amedraa.  (Order, Docket No. 71.)  The parties stipulated that Amedraa owned the FNMA Series CMO, but could not agree as to who owned the interest that the FNMA Series CMO had earned while it was in JDA's possession.  Both JDA and Amedraa assert adverse claims to the interest held in the CISC Account that is attributable to the FNMA Series CMO, as well as the interest earned on the FNMA Series CMO from January 2009 through October 2009 while it was in JDA's possession.

Finally, on April 14, 2010, the Court approved a Joint Stipulation between Betts and Gambles, JDA, Divens, and CISC, and ordered that the Cobalt CMO be released from the Account and transferred to Betts and Gambles.  (Order, Docket No. 85.)  Although the parties stipulated that Betts and Gambles owned the Cobalt CMO, the parties could not agree as to who owned the interest that the FNMA Series CMO had generated while it was in JDA and Divens's possession.  Both JDA and Betts and Gambles assert adverse claims to the interest held in the CISC Account that is attributable to the Cobalt CMO, as well as the interest earned from the

Cobalt CMO from February 2009 through October 2009 while the FNMA Series CMO was in Divens's possession.

On March 3, 2010, the Court granted CISC's unopposed Motion to Deem the Account Deposited with the Court ("Motion to Interplead") and discharged CISC from the action.  (Order, Docket No. 75.)  On June 10, 2010, the Court granted in part CISC's request for attorneys' fees incurred in connection with the interpleader action and awarded CISC fees of $24,834.90, to be paid from the assets in the Account.

**C.   Remaining Issues for Trial**

In sum, as of the trial date in June 2010, the only remaining disputes were: (1) whether the interest earned on the Cobalt CMO (both while the Cobalt CMO was in the CISC Account and prior to that time when it was in Divens's possession) belongs to JDA or Betts and Gambles; and (2) whether the interest earned on the FNMA Series CMO (both while the FNMA Series CMO was in the CISC Account and prior to that time when it was in JDA's possession) belongs to JDA or Amedraa LLC.

The Court held a bench trial on these issues on June 24 and 25, 2010.  The Court heard testimony from James Savor on behalf of Amedraa and Jon Divens on behalf of JDA and himself.  Additionally, direct testimony declarations of Evelyn Aardema, one of the member-managers of Amedraa, LLC, and Seth Beoku Betts, the president of Betts and Gambles Investments, Inc., were admitted without objection.  Finally, the Court permitted the parties to submit post-trial briefing on an issue of law regarding JDA's status as an entitlement holder under the California Commercial Code.[2]

Having thoroughly examined the evidence and the testimony of the witnesses, and having considered the arguments and briefs of all parties, the Court makes the following findings of fact and conclusions of law.

---

[2] JDA and Divens also submitted a direct testimony declaration of Frank Wilde; however, Frank Wilde was not called as a witness at trial.  The Court sustains Betts and Gambles's hearsay objections to paragraphs 3, 7, and 8 of the Wilde Declaration.  The Court also sustains Betts and Gambles's objections to paragraphs 5, 6, 7, and 9 on the ground that the statements in these paragraphs lack foundation.  Finally, Wilde's assumptions about the mental state of the owners of the CMOs stated in paragraph 7 lack foundation and are pure speculation.  The remaining paragraphs of the Wilde Declaration are not substantively important.

## II.  FACTUAL FINDINGS

As a preliminary matter, the Court notes that resolution of many of the factual disputes between the parties turns in large part on the credibility of the witnesses.  In that regard, the Court finds that Divens's testimony was wholly incredible.  The Court does not believe that Divens had any agreement with any representative or agent of Betts and Gambles or Amedraa that entitled Divens or JDA to the interest generated by the Cobalt CMO or the FNMA Series CMO.  Instead, Divens acquired the CMOs under the false promise that he would act solely as an escrow agent with regard to the CMOs.  Once the CMOs were in Divens's possession, he absconded with the assets, moving them to different accounts at different institutions so they could not be located and stealing the interest generated from the CMOs for his own personal use.  In short, the Court finds that Divens created a scheme to defraud Betts and Gambles and Amedraa and to steal their assets.  His testimony is not credible.

In contrast, having observed the witness, the Court finds that James Savor's testimony was credible.  Moreover, Savor's testimony was corroborated by the exhibits admitted at trial.  With those considerations in mind, the Court makes the following factual findings.

### A.    The Cobalt CMO (Betts and Gambles)

Prior to February 2009, Betts and Gambles purchased and owned a collateralized mortgage obligation issued by CW Capital, referred to as CW Capital Cobalt Series 2007-C3 CL, CUSIP number 19075DAG6 ("the Cobalt CMO").  Divens does not dispute that Betts and Gambles is, and at all relevant times was, the owner of the Cobalt CMO.  The face value of the Cobalt CMO is $1,008,402,393; however, the actual value of the Cobalt CMO is considerably less.

According to its terms, the Cobalt CMO provided for a monthly interest payment of $31,014.42 through its maturity date of May 15, 2046.  In fact, however, the amount of interest generated by the Cobalt CMO varied monthly.  From February 2009 through April 2010, the interest generated by the Cobalt CMO varied from approximately $23,500 to $30,500 per month.

In early January 2009, Betts and Gambles entered into a contract to sell the Cobalt CMO to a company called Up Right Holdings for a

purchase price of $60,504,143.58.   In connection with the proposed sale, the principal of Up Right Holdings, Jaime Williams ("Williams"), suggested to the president of Betts and Gambles, Seth Beoku Betts ("Mr. Betts"), that the parties use Jon Divens as the escrow agent to hold the Cobalt CMO while Up Right Holdings arranged financing for the sale. Mr. Betts agreed.

On or about February 3, 2009, Betts and Gambles transferred the Cobalt CMO from its securities account at Pension Financial Services to JDA's Business Services Account at UBS (hereinafter, "the JDA UBS Account"), which was controlled by Divens.   Divens's only obligation was to hold the Cobalt CMO escrow pending the sale of the asset to Up Right Holdings.   Neither Up Right Holdings nor Divens provided any consideration for the transfer.   No written escrow agreement or escrow instructions were ever entered into between Betts and Gambles and Divens.

Ultimately, Up Right Holdings was unable to finance the purchase of the Cobalt CMO.   On March 6, 2010, at the request of Mr. Betts, counsel for Betts and Gambles, Derek Roberson, sent Divens a letter indicating that Up Right Holdings was unable to arrange financing and could not provide the advance payment required to purchase the Cobalt CMO.   Roberson further stated that Betts and Gambles had no contractual or other obligation to enter the Cobalt CMO into any trading platform and had not consented to the investment of the Cobalt CMO in any trading platform.   Roberson demanded the immediate return of the Cobalt CMO to Mr. Betts at the originating securities account at Pension Financial Services and provided wiring coordinates.   Divens did not respond to the March 6, 2009 letter.

On March 10, 2009, Roberson sent Divens a letter via fax, again demanding that Divens immediately return the Cobalt CMO to Mr. Betts's account.   Divens did not respond.

Also in March 2010, Mr. Betts called Divens and left several messages on his voicemail asking Divens to return his calls.   Mr. Betts also sent Divens several text messages indicating that Betts and Gambles was trying to reach him regarding the Cobalt CMO.   Divens never returned any of Mr. Betts's calls.

On May 5, 2009, counsel for Betts and Gambles, John D. Kelner,

sent another letter to Divens demanding the return of the Cobalt CMO to Betts and Gambles.  The letter indicated that if the Cobalt CMO was not returned within 30 days, Betts and Gambles would file a civil complaint against Divens for theft.  Divens did not respond.

Divens testified that when he first received the Cobalt CMO in the JDA UBS Account in February 2009, Williams told him that the Cobalt CMO belonged to her and that she wanted to place the Cobalt CMO into trade. Divens testified that when he initially received the Cobalt CMO he did not know anything about Betts and Gambles.  However, Divens also testified that within "a week or a month" of the transfer of the Cobalt CMO to JDA's UBS account, Williams told him that, in fact, Betts and Gambles was the owner of the Cobalt CMO and that Williams was a broker trying (unsuccessfully) to purchase the Cobalt CMO from Betts and Gambles.  Thus, even if the Court credits Divens's testimony that he did not know initially that Betts and Gambles owned the Cobalt CMO, as of March 6, 2009, when Betts and Gambles contacted Divens demanding the return of the Cobalt CMO, Divens knew that Betts and Gambles was the owner of the Cobalt CMO and that Up Right Holdings could not generate the funds to purchase it.

Divens testified that after he learned about Betts and Gambles in February or March 2009, Betts and Gambles orally agreed on a phone call with Divens that Divens could place the Cobalt CMO into a trade program.  The Court does not find this testimony credible.  Divens has not presented any evidence, other than his self-serving testimony, that any such agreement existed.[3]  Furthermore, Divens's testimony is flatly contradicted by the letters Betts and Gambles sent to Divens on March 6, 2009, March 10, 2009, and April 5, 2009, in which Betts and Gambles's counsel clearly indicated that Betts and Gambles "**has never given its consent to the investment of its CMO into any such [trade] platform**" and demanded return of the Cobalt CMO.  The Court finds that Betts and Gambles never authorized Divens to take any action other than

---

[3] Divens presented trial exhibit 35, which appears to be a draft agreement dated March 2009 that purports to authorize Divens to enter the Cobalt CMO into trade and to split the profits with Betts and Gambles and Up Right Holdings.  However, this agreement was never signed by anyone from Betts and Gambles or Up Right Holdings.

hold the Cobalt CMO in escrow pending the proposed sale to Up Right Holdings.

On or about July 15, 2009, Betts and Gambles filed a civil Complaint against Divens in the Circuit Court for Palm Beach County Florida, Case No. 2009 CA 016734 XXXX MB for breach of contract, replevin, fraud and civil theft ("the Florida Complaint"). The complaint sought damages in the amount of $60,504,143.58, which represents the proposed purchase price of the Cobalt CMO. The Court takes judicial notice of the Florida Complaint.

On October 6, 2009, the Florida Circuit Court entered a judgment in favor of Betts and Gambles and against Jon Divens in the amount of $60,504,143.58. On November 25, 2009, the Superior Court of Los Angeles County in Case No. BS123564 entered a Judgment on the Sister-State Judgment from the Florida Court in the amount of $60,504,143.58 plus post-judgment interest in excess of $400,000. The Court takes judicial notice of these judgments.

In April 2010, Divens stipulated to return the Cobalt CMO to Betts and Gambles while this action was pending. On April 16, 2010, the Court entered an order authorizing the transfer of the Cobalt CMO from Divens's CISC Account to Betts and Gambles. The transfer was accomplished on April 26, 2010. Pursuant to an agreement between Divens and Betts and Gambles, once the transfer of the Cobalt CMO was complete Betts and Gambles acknowledged partial satisfaction of the judgments against Divens in the amount of $55 million.

Although Betts and Gambles has recovered the Cobalt CMO, it has not recovered any of the interest generated from the Cobalt CMO while it was in Divens's possession, from February 3, 2009 to April 26, 2010. During this period, the Cobalt CMO generated the following amount of interest:

///
///
///
///
///
///
///

| Month | Interest |
|---|---|
| February 2009 | $24,117.71 |
| March 2009 | $24,087.06 |
| April 2009 | $30,657.93 |
| May 2009 | $24,002.04 |
| June 2009 | $30,557.22 |
| July 2009 | $23,926.76 |
| August 2009 | $30,444.08 |
| September 2009 | $30,387.14 |
| October 2009 | $23,800.49 |
| November 2009 | $30,264.31 |
| December 2009 | $23,711.89 |
| January 2010 | $23,663.60 |
| February 2010 | $23,622.43 |
| March 2010 | $23,582.93 |
| April 2010 | $29,937.95 |
| **TOTAL** | **$396,763.54** |

From February 2009 to September 2009, Divens transferred the Cobalt CMO from his UBS Account to several other securities accounts at different institutions prior to moving the Cobalt CMO to the CISC Account.[4]

From February 2009 to the end of October 2009, Divens received a total of $241,980.43 in interest from the Cobalt CMO. Divens admitted that he never paid any of this interest to Betts and Gambles. Divens further testified that at various points between February and October 2009, he transferred the interest earned on the Cobalt CMO out of the various securities accounts where the Cobalt CMO was held and into his business account at Bank of America.[5] Divens testified that he used these interest payments for his "personal use."

---

[4] Divens testified that the Cobalt CMO was in the JDA UBS Account in approximately March 2009. From there, the Cobalt CMO was transferred to a Smith Barney account where it remained for 2 months. In the Spring of 2009, the Cobalt CMO was transferred to an account with a company called Capstone, and then it was transferred again in the summer of 2009 to an account with a company called Asset Enhancement Management. In the late summer, Divens transferred the Cobalt CMO to an account with a firm called Matrix. Finally, in September 2009, Divens transferred the Cobalt CMO to the CISC Account. (See Divens's Depo., dated April 8, 2010, at 114:14-121:23.)

[5] While the Cobalt CMO was in the CISC Account, the incoming interest payments generated by the CMO were automatically reinvested in a money market mutual fund in the CISC Account. (Divens's Tr. Exh. 28 [Declaration of Michele Fanner ¶ 9].) Divens frequently instructed Michele E. Fanner, a Financial Advisor and Vice President of Investments at CISC, to liquidate the money market funds and wire the cash balance to Divens's outside account at Bank of America. (Id.) The last of such wire transfers took place on October 27, 2009. (Id.)

In mid-November 2009, CISC froze the CISC Account.  From November 2009 to April 26, 2010, when the Cobalt CMO was returned to Betts and Gambles, the interest earned on the Cobalt CMO accumulated in the CISC Account along with interest earned from other CMOs held in the Account. Pursuant to a stipulation by all parties, the Court finds that 69% of the funds currently held in the CISC Account are attributable to interest earned on the Cobalt CMO.

**B.    The FNMA Series CMO (Amedraa LLC)**

Amedraa LLC ("Amedraa") was formed in 2008 for the purpose of investing in and owning securities, including Collateralized Mortgage Obligations ("CMOs").[6]  On or about July 29, 2008, Amedraa purchased a CMO issued by the Federal National Mortgage Association and identified as FNMA Series 2003-W19, Class 1-IO-1 0.33048% 11/25/2043 GTD Remic Pass Thru CTF Whole Loan, CUSIP 31393UA86, with a face value of $305,000,000 (hereinafter, the "FNMA Series CMO").  Amedraa paid $2 million for the FNMA Series CMO.  After the purchase, Amedraa held the FNMA Series CMO as a book entry with Pension Securities Transworld Financial in Dallas, Texas.

As stated above, the FNMA Series CMO is an interest-only CMO, which entitles the owner of the CMO to a portion of the interest payments on the mortgages owned by the CMO.  The interest is paid on a monthly basis.  From January 2009 to April 2010, the interest earned by the FNMA Series CMO ranged from approximately $13,200 to $16,800 per month.

In December 2008, Amedraa entered into a Joint Venture Agreement with LNJ Enterprise, LLC ("LNJ").  The Joint Venture Agreement authorized LNJ and its Vice President, James Savor ("Savor"), to act as Amedraa's agent for purposes of placing the FNMA Series CMO with a broker for investment purposes.  Prior to December 2008, Savor did not have extensive experience with investing or trading CMOs.  However, in talking with others about investing CMOs, Savor was forewarned not to do business with a man named Frank Wilde ("Wilde") or a company called Matrix Holdings.

---

[6] Evelyn Aardema is one of the member-managers of Amedraa and submitted a direct-testimony declaration in this action, to which Divens made no objection.

### 1.   The Asset Management Agreement Between LNJ and Wiseguy's Investments LLC (WGI)

In December 2008, Savor entered into negotiations with Steve Woods, the principal of Wiseguy's Investments LLC ("WGI"), regarding entering the FNMA Series CMO into an investment program.  Woods represented to Savor that WGI had established credit lines and relationships with various financial institutions that would allow WGI to use the value of FNMA Series CMO combined with other assets to buy bank debt, which debt could then be sold for a greater value than the book value of the CMO.  The strategy was to use the CMO in a "managed buy-sell program," whereby the trader, WGI, would use the value of the CMO along with other assets to buy bank debt at a wholesale rate, for example 60 cents on the dollar, and then resell the debt to a third party for a higher rate, for example 65 cents on the dollar.  WGI would then split the profit from the sale with LNJ.

On December 8, 2008, LNJ entered into a written Financial Consulting and Asset Management Agreement with WGI (hereinafter "the Asset Management Agreement").  The Asset Management Agreement provided that LNJ would deliver the FNMA Series CMO (along with two other CMOs controlled by LNJ) to WGI.  WGI would then "identify and manage the entry of [the CMOs] into one or more investment opportunities."

Pursuant to the Asset Management Agreement, WGI agreed to make an advance payment of 1% of the face value of the CMOs to LNJ within 5 business days of LNJ's delivery of the CMOs to WGI.  Thereafter, LNJ and WGI would split any profits generated by the investment programs according to a percentage schedule detailed in the Asset Management Agreement.  Savor testified that the advance payment was critical to the transaction because it provided the owners of the CMOs with some security – that is, even if the trading programs were not profitable, the owners of the CMOs would have at least recouped a large portion of their original investment through the advance payment.  The Asset Management Agreement was signed by Steve Woods of WGI and Linda Starr, the President of LNJ.

The Asset Management Agreement made some mention of the name "Matrix Holdings/WGI."  When Savor noticed this name in the contract, he questioned Woods extensively as to whether Frank Wilde had any

involvement with the Asset Management Agreement.  Savor told Woods that
he wanted nothing to do with Wilde.  Bethel Harris ("Harris"), counsel
for LNJ, also questioned Woods to make sure that Wilde was not involved
in the transaction.  Woods unequivocally told Savor and Harris that
Wilde was not involved.

### 2.   The Escrow Agreement

In connection with the Asset Management Agreement, Woods suggested
to Savor that LNJ transfer the FNMA Series CMO to the escrow account of
the Law Offices of Jon Divens & Associates LLC ("JDA") pending WGI's
payment of the 1% advance payment.  Divens is the sole member of JDA
and is a licensed California attorney.  Savor had never done business
with Divens or JDA in the past.

On December 31, 2008, LNJ, WGI and JDA entered into an Escrow
Agreement.  The Escrow Agreement provides that LNJ will deposit certain
CMOs into the escrow account of JDA.  It further provides that LNJ and
WGI agree that an advance payment of 1% of the face value of the CMOs
would be paid into the escrow account within one business day of
delivery of the CMOs into the account.  Once WGI deposited the advance
payment in escrow, JDA was required to wire the advance payment to LNJ
and then release the CMOs to WGI so that the CMOs could be used one or
more investment programs.  Paragraph 4 of the Escrow Agreement provides
in relevant part:

> [T]he Escrow Agent's only responsibility and obligation to
> the Client [LNJ] and the Company [WGI] shall be to hold the
> CMOs and disburse the Advance Payment . . . .  In the event
> that the CMOs are delivered to the escrow account and the
> Advance Payment is not deposited by the Company [WGI], it
> shall be the Escrow Agent's duty to return the CMOs via DTC
> transfer to the coordinates given by the Client [LNJ].

(Tr. Exh. 4 [December 2008 Escrow Agreement].)  The Escrow Agreement
provides that no oral instructions would be honored.  Finally, the
Escrow Agreement provides that WGI would be solely responsible for all
fees associated with the escrow, distribution of the advance payment,
and delivery of the CMOs to WGI.

Divens signed the Escrow Agreement on December 22, 2008.  Steve
Woods on behalf of WGI and Linda Starr on behalf of LNJ signed the

Escrow Agreement on December 31, 2009 and December 21, 2009, respectively.

Divens admitted at trial that his role with regard to the CMOs controlled by LNJ, including the FNMA Series CMO, was to act as an escrow agent until the advance payment was disbursed to LNJ. Divens testified: "Essentially, [I] was going to keep the CMOs under my control until a payment had been made." Further, Divens admitted that he had no agreement with LNJ prior to March 2009 that authorized him to invest or trade the FNMA Series CMO.[7]

### 3. WGI Fails to Make the Advance Payment

On January 5, 2009, LNJ received confirmation that the FNMA Series CMO had been transferred successfully to the Morgan Stanley securities account controlled by Divens and JDA (hereinafter, "the JDA Morgan Stanley Account"). In the first week of January 2009, Savor and Harris began making demands upon Woods for delivery of the 1% advance payment. However, Woods stalled Savor and Harris and did not give an explanation as to why the advance payment had not yet been delivered into the escrow account.

On January 14, 2009, Savor learned from a broker named Sharon Roitman that the JDA Morgan Stanley Account had been suspended. Savor immediately contacted Divens to learn what had happened to the CMOs in the account. Divens told Savor that the JDA Morgan Stanley Account had been shut down and that the CMOs were transferred to a UBS Financial Services Account controlled by Divens and JDA (hereinafter, the "JDA UBS Account"). At that point, because the advance payment had not been made and because Divens had moved the CMOs without notifying Savor, Savor made an oral request for the return of the CMOs. Divens told Savor that he would have to speak with Woods about returning the CMOs.

When Savor spoke to Woods, Woods told him that WGI had been unable to place the CMOs in a trading program and that WGI could not perform under the Asset Management Agreement. Woods told Savor to talk to Divens about getting the CMOs returned to LNJ.

In or about the third week of January 2009, Savor spoke to Divens on the phone and Divens agreed to return the CMOs to LNJ. However,

---

[7] See Divens's Deposition, dated April 8, 2010, at 49:5-8.

Divens failed to do so.

### 4.   Divens and Wilde Make Several Unauthorized Attempts to Sell, Encumber, or Trade the FNMA Series CMO

In late January 2009, Savor received a phone call from Divens and Frank Wilde.  Wilde identified himself as Divens's partner.[8]  Wilde's name "set off a red flag" for Savor as he had previously been forewarned not to do business with Wilde.  Savor told Divens and Wilde that he wanted the CMOs returned.  In response, Wilde told Savor that the CMOs could not be returned because they had already been entered into a trading program.  Savor was baffled.  Savor told Wilde that LNJ did not have an agreement with Wilde to trade the CMOs and that by keeping the CMOs and entering them into trade, Wilde and Divens were stealing property.  Wilde said there was nothing he could do because the CMOs were already in trade and it would cost a lot of money to get them back.  The call ended without a resolution.[9]

On or about February 2, 2009, Savor had a telephone conversation with a broker who worked with a joint venture partner of LNJ.  The broker told Savor that he had been contacted by Frank Wilde and that Wilde had tried to sell the broker certain CMOs, including the FNMA Series CMO owned by Amedraa.  Savor was shocked.

Savor immediately called Divens and spoke with Divens and Wilde together via conference call.  Savor confronted Wilde about trying to sell the CMOs subject to the Asset Management Agreement, including the

---

[8] Divens testified that Wilde had acted as Divens's business partner in several prior deals and that Wilde was acting as a business partner of Steve Woods and WGI in the transaction involving the FNMA Series CMO.  Divens testified that Wilde was attempting to enter the FNMA Series CMO into a trade program consistent with the Asset Management Agreement between LNJ and WGI.

Regardless of whether Wilde and WGI were in fact business partners in connection with the Asset Management Agreement, the Court believes that no such relationship was ever disclosed to Savor.  Further, there is no evidence that Divens ever disclosed his prior business relationships with Wilde prior to entering into the Escrow Agreement with LNJ.

[9] Divens testified that in late January 2009, Savor had a telephone conversation with Wilde and Divens in which Savor agreed to allow Wilde to find a trade program for the FNMA Series CMO.  Divens also testified that, in this same conversation, Savor agreed to enter into a joint venture agreement with Wilde and Divens regarding trading the FNMA Series CMO.

The Court does not find this testimony credible.  As explained below, Divens's testimony is flatly contradicted by numerous emails and letters in February 2009 between Savor, Harris, Divens, and Wilde in which Savor and Harris repeatedly tell Divens and Wilde that they are not, and never have been, authorized to trade the FNMA Series CMO.

FNMA Series CMO.  Wilde denied trying to sell the CMOs but nonetheless told Savor that the CMOs had been entered into a private placement trading platform.  In response, Savor again told Wilde that LNJ did not have any agreement with Wilde that would allow Wilde to trade the CMOs, and that Divens was not to trade the CMOs, but rather to act solely as an escrow agent.  Savor told Divens and Wilde that any attempts to encumber the CMO constituted a theft of LNJ's property.  Savor demanded immediate return of the CMOs.  Wilde reiterated that the CMOs were already in trade and there was nothing he could do.

On February 3, 2009, Savor sent an email to Divens, Wilde, and Woods (among others) stating: "It has come to my attention today that Frank Wilde in [sic] interested in doing something with our CMO's that LNJ Enterprise LLC has in your escrow account at UBS. . . . I have not spoken to Frank and have not authorized anything regarding the CMO's. **Specifically, the CMO's are to remain unencumbered and not used for any purpose.**"  Savor also demanded that Divens turn over to LNJ the monthly interest payments that the CMOs had generated since they had been in JDA's account.

The next day, February 4, 2009, Woods responded to Savor via email and told him that, "your CMOs remain in the account of Jon Divens unencumbered."  Woods also wrote that "cmos pay interest to the owner, which is you."  Woods suggested that Savor contact Divens and Wilde about their offer to enter the CMOs into trade.  Woods wrote that Wilde would explain the details and that "if you do not wish to move on his offer[,] no problem the asset remains in tact [sic]."  Once again, Savor could not understand why Wilde or Divens were involved in any attempts to trade the CMOs controlled by LNJ.

Also on February 4, 2009, Woods sent Savor an unsolicited purchase agreement on JDA/Divens letterhead, which Divens had already executed.  The purchase agreement stated that Savor was to sell the FNMA Series CMO to an entity identified as PM Management Services, and that Divens would act as the escrow agent for the sale.  Savor had never heard of PM Management Services and had not authorized any sale of the FNMA Series CMO.  Savor did not sign the sale agreement.

In mid-February 2009, Savor and Harris contacted Woods to try and resolve what was happening with the CMOs.  Woods told Savor that WGI

was unable to place the CMOs into any investment or trading program. Further, WGI still had not made the advance payment to LNJ for the CMOs.  Thus, on February 16, 2009, LNJ's counsel, Bethel Harris, emailed Jon Divens and Steve Woods, stating: "**As per the escrow agreement, since WGI was unable to place the CMOs in a private placement platform, we are requesting that the bonds be returned.**" Harris stated that Savor would be sending wiring coordinates for the transfer of the CMOs.  On the same day, Savor sent Divens and Wilde an email reminding them that they had no authority to trade or encumber the CMOs.

Divens responded to Harris and Savor via email on February 17, 2009.  The email stated in its entirety: "per the instructions of the contracted parties the cmo package address [sic] in you [sic] email was sent out to a trade program.  Please contact mr. frank wilde for further details."  Divens did not return the CMOs to Savor.

In the weeks that followed, Savor and Harris had several additional conversations with Wilde, many of which were hostile.  On February 18, 2009, Wilde emailed Savor and told him that Wilde and Divens had placed the CMOs in a trading program.  Wilde indicated that since Savor did not communicate with him after rejecting the proposed sale of the FNMA Series CMO to PM Management, Wilde was under the impression that Savor consented to Divens and Wilde placing the FNMA Series CMO into trade.  Wilde also sent Savor a draft agreement that would authorize Wilde and Divens to place the FNMA Series CMO into a trading program, thereby memorializing what Wilde claimed he had already done.  Savor refused to sign the February 18, 2009 agreement.

On or about February 18, 2009, Savor set up a conference call with Divens and Wilde to resolve the situation regarding the CMOs.  Neither Divens nor Wilde took the call.  On the same day, Harris sent Divens and email stating: "As you are well aware (i) **we never contracted with Frank [Wilde] to have the CMOs placed into any trade program, (ii) we never gave permission to you to move the CMOs from your escrow account, and (iii) Steve Woods concurred that the CMOs should be returned to LNJ Enterprise**."  Harris threatened to report Divens to the California Bar Association, the FBI, and the SEC.  Divens did not respond.

Savor sent two similar emails to Divens and Wilde on February 20, 2009 and February 21, 2009. Savor wrote: "At this point I have no other alternative than to take the position that the two of you (Jon Divens, Frank Wilde) have stolen property that does not belong to you and violated numerous laws in doing so." Savor also made it clear that he never agreed to allow Divens or Wilde to trade the FNMA Series CMO and that the only contract Savor ever had regarding investment of the FNMA Series CMO was with WGI, which Woods confirmed was now void.

On February 23, 2009, Savor and Harris traveled to Los Angeles in the hopes of meeting with Divens and Wilde in person to find out what had happened to the FNMA Series CMO and the other assets entrusted to Divens. Savor called and sent numerous text messages and emails to Divens and Wilde to set up a meeting, but neither Divens nor Wilde responded. While in Los Angeles, Savor contacted the Beverly Hills Police Department regarding Divens's theft of the FNMA Series CMO. Savor also contacted the United States Attorney, the SEC, and the FBI.

On February 23, 2009, Evelyn Aardema, the principal of Amedraa LLC sent Divens and Wilde a formal cease and desist letter. The letter stated that Amedraa was the owner of the FNMA Series CMO; that neither Divens nor Wilde were authorized to trade the CMO; that the Asset Management Agreement with WGI was void due to WGI's inability to place the CMOs into trade; and that Divens and Wilde were ordered to immediately return the FNMA Series CMO to LNJ.

On February 26, 2009, Savor left phone messages for Divens and Wilde stating that Savor had contacted the Beverly Hills Police Department about theft of the CMOs. Wilde responded to the message via email, stating that Divens would not release the FNMA Series CMO to LNJ unless LNJ agreed to a trade deal with Wilde and Divens.[10] Divens, Wilde, Harris, and Savor then had a phone conference regarding the terms of the trade program into which Divens and Wilde had purportedly placed the FNMA Series CMO. However, Wilde and Divens would not give Savor any specific information about where Divens had sent the FNMA Series CMO.

---

[10] This email could not be located by Amedraa's counsel and was not produced to the Court. Nonetheless, Divens made no objection to Savor's testimony regarding the contents of the email and the Court finds such testimony credible.

On February 27, 2009, Savor emailed Wilde and Divens stating that the trade deal that Wilde proposed was unacceptable. **Savor again demanded that Divens immediately return the CMOs, including the FNMA Series CMO, to LNJ.** Savor provided wiring coordinates for an LNJ securities account where the CMOs were to be returned. Once again, Divens did not return the CMOs.

After this last email, Savor did not receive any response from Divens or Wilde for nearly a week. Then, on or about March 4, 2009, Savor was finally able to reach Wilde via phone. Wilde refused to give the FNMA Series CMO back to LNJ, claiming that the CMO had already been entered into a trading program. Wilde stated that if LNJ would enter into a contract with Divens and Wilde, they could split the profits generated by the trade program. Wilde said that he would be getting paid from the trading program within the next week or two.

Savor discussed Wilde's proposal with the principals of Amedraa LLC, Evelyn Aardema and her husband ("the Aardemas"). Savor did not want to enter into any agreement with Divens or Wilde because he feared that doing so would give Wilde and Divens legal rights regarding the assets that they had stolen and traded without authorization. However, the Aardemas felt that they had no choice but to enter into a deal with Wilde and Divens. Despite numerous demands from both Savor and Evelyn Aardema, LNJ had not been able to get the FNMA Series CMO back from Divens. The Aardemas believed that signing a binding contract with Wilde and Divens was the only option they had for exercising some control over the FNMA Series CMO; further, if Divens and Wilde did not perform on the contract, the Aardemas believed it would be easier to get the FNMA Series CMO returned. Thus, the Aardemas authorized Savor to enter into a contract with Divens and Wilde.

**5.    The March 2009 Agreement**

On or about March 12, 2009, LNJ entered into an agreement with the Law Offices of Jon Divens and Associates ("JDA") and Matrix Holdings LLC. Frank Wilde is the Managing Director of Matrix Holdings LLC. The March 2009 Agreement provides that two CMOs, including the FNMA Series CMO and one other, had been previously delivered to JDA/Matrix Holdings and had been entered into an investment program on or about February 16, 2009. The March 2009 Agreement also provides that any profits from

the investment program would be split equally, with 50% to be paid to LNJ, and the remaining 50% to be paid to JDA and Matrix Holdings.

The term of the March 2009 Agreement was from March 10, 2009 to March 31, 2010.  The agreement provides that although the CMOs were delivered to JDA/Matrix, "Party 2 [LNJ] shall remain the sole legal and beneficial owner of the CMO at all times during the term of this Agreement."  It also provides: "Furthermore, at the end of the term of this Agreement, the CMO shall be returned free and clear and unencumbered by Party 1 [JDA/Matrix Holdings] to Party 2 [LNJ] . . . ."  (Tr. Exh. 20, ¶ 3 [March 2009 Agreement].)

Paragraph 12 of the March 2009 Agreement provides that "approximately $1,000,000 (USD) shall be paid to Party 2 [LNJ] within two (2) weeks from the execution of this agreement, or such additional amount as actually be earned and paid to Party 1 [JDA/Matrix Holdings]."  If JDA/Matrix Holdings failed to pay the $1 million payment or any other payment due under the contract and did not cure such failure within 7 business days, the March 2009 Agreement provides that LNJ may recall the CMOs.

### 6.   JDA Fails to Make Any Payments to LNJ and Absconds with the FNMA Series CMO

In late March 2009, JDA and Matrix had not made any payments under the March 2009 Agreement.  Additionally, JDA had not paid LNJ any of the interest earned on the FNMA Series CMO since January 2009.  On March 25, 2009, Savor emailed Divens regarding the interest that the FNMA Series CMO had generated while in JDA's possession.  Savor wrote: "You owe LNJ Enterprise the interest payments for at least the last three months.  That's around $30,000. . . . I take this to mean that you have no intention in paying the ayments [sic] and trying to keep the money for yourself."

Divens responded the next day, and promised Savor: "**we have every intention of paying you every dime earned on your CMO.**"  Divens stated that he hoped to have all payments to LNJ within a matter of days.  However, JDA did not pay.

On March 31, 2009, Harris wrote a letter to Divens and Wilde informing them that they were in breach of the March 2009 Agreement by failing to pay the required $1,000,000 payment by March 27, 2009.

Thereafter, Divens made repeated promises to pay LNJ the amounts due under the March 2009 Agreement, but JDA never did so.

On April 14, 2009, the President of LNJ, Linda Starr, sent Divens and Wilde a formal notice of default of the March 2009 Agreement. The notice stated that JDA and Matrix Holdings had failed to pay the $1,000,000 payment provided for in Paragraph 12 by March 27, 2009, and had failed to make weekly payments thereafter as provided for in the agreement. Starr demanded that the CMOs be returned to LNJ within 5 business days and provided wiring coordinates for the account to which the CMOs should be delivered. Neither Divens nor Wilde responded. After April 14, 2009, Savor and Harris lost all contact with Divens and Wilde.

It is undisputed that JDA never made any payments to LNJ under the March 2009 Agreement. It is also undisputed that the FNMA Series CMO was never successfully entered into any trading program. Divens admitted that LNJ made several demands for return of the FNMA Series CMO.

After April 2009, JDA continued to hold onto the FNMA Series CMO and transferred it to several different financial institutions so that LNJ could not locate the asset. In total, JDA moved the FNMA Series CMO to at least six different financial institutions between January 5, 2009 and September 2009,[11] when it was finally moved to the CISC Account.[12] The FNMA Series CMO remained in the CISC Account from

---

[11] Divens testified that the FNMA Series CMO was transferred to the JDA UBS Account in January 2009. Between February and March 2009, Divens transferred the FNMA Series CMO to an account in JDA's name at JP Morgan. In March or April 2009, Divens once again transferred the FNMA Series CMO to an account at Smith Barney. In the summer of 2009, Divens transferred the FNMA Series CMO twice more – first to a Capstone account, and shortly thereafter, to an account with a brokerage firm called Matrix. Finally, in or about September 2009, Divens transferred the FNMA Series CMO to the CISC Account. (See Trial, 06/25/10, at 95:18-97:5.)

[12] Divens testified that he moved the FNMA Series CMO to different accounts in connection with various trade opportunities that he had secured. Divens contends that in March 2009 both the Cobalt Series CMO owned by Betts and Gambles and the FNMA Series CMO were placed with a trade group called MST and remained there for three months. When that trade opportunity failed, Divens contends that he moved the CMOs in July 2009 to place them with a trade group called AEG. Divens contends that he had negotiated a third trading opportunity for the CMOs in September 2009.

Divens admits that none of his attempts to trade the Cobalt Series CMO or the FNMA Series CMO were successful.

September 2009 until March 2010 when it was transferred back to LNJ pursuant to a stipulation and order in this litigation.

The FNMA Series CMO continued to earn interest income in each account while it was in JDA's possession, as follows:

| Month | Interest |
|---|---|
| January 2009 | $16,847.29 |
| February 2009 | $16,677.63 |
| March 2009 | $16,458.13 |
| April 2009 | $16,182.34 |
| May 2009 | $15,975.53 |
| June 2009 | $15,653.59 |
| July 2009 | $15,377.44 |
| August 2009 | $15,069.34 |
| September 2009 | $14,738.15 |
| October 2009 | $14,464.92 |
| November 2009 | $14,321.64 |
| December 2009 | $14,166.64 |
| January 2010 | $13,960.47 |
| February 2010 | $13,712.60 |
| **TOTAL** | **$213,605.70** |

From January 2009 to the end of October 2009, the FNMA Series CMO generated a total of $157,444.40 in interest.  Divens admitted at trial that JDA never paid any of this interest to LNJ or Amedraa.  Divens further testified that he withdrew all of the interest earned on the FNMA Series CMO from each account where the CMO was held until CISC froze the CISC Account in November 2009.  Divens transferred these interest payments to his business account at Bank of America and used it for his personal needs.

From November 2009 when CISC froze the CISC Account until March 2010 when the FNMA Series CMO was returned to Amedraa, the interest earned on the FNMA Series CMO accumulated in the CISC Account along with interest earned from other CMOs.  Pursuant to a stipulation by all parties, the Court finds that 31% of the funds currently held in the CISC Account are attributable to interest earned on the FNMA Series CMO.

## III. CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

CISC brought this interpleader action under 28 U.S.C. § 1335, or alternatively, pursuant to Federal Rule of Civil Procedure 22.  Rule 22 is not itself a source of federal jurisdiction; in a Rule 22

interpleader action, subject matter jurisdiction is determined in the same manner as in other civil actions.  WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 10:107 (Rutter Group 2009).  Diversity jurisdiction exists if the amount in controversy exceeds $75,000 and there is complete diversity between the plaintiff-in-interpleader and all of the defendants-in-interpleader.  Id. (citing Francskin v. Credit Suisse, 214 F.3d 253, 259 (2d Cir. 2000)); see Travelers Ins. Co. v. First Nat'l Bank of Shreveport, 675 F.2d 633, 638 n.9 (5th Cir. 1982).

These requirements are met here.  Complete diversity exists between the plaintiff-in-interpleader, CISC, which is a citizen of Delaware and Illinois, and the defendants-in-interpleader, who are citizens of California, Florida, Idaho, Indiana, Nevada, Colorado, and Virginia.  The amount of assets held in the CISC Account exceeds $75,000.[13]

Amedraa's and Betts and Gambles's crossclaims against Divens and JDA for the interest earned on the CMOs while the assets were in Divens's possession are proper under Federal Rule of Civil Procedure 13(g).  Both Amedraa's and Betts and Gambles's crossclaims arise out of the same transaction that is the subject matter of the original interpleader action.  Additionally, the crossclaims relate to property that is the subject matter of the original action – namely, the Cobalt CMO and the FNMA Series CMO. Fed. R. Civ. Proc. 13(g); see 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL § 1431 (3d ed. 2010 update) (the "transaction or occurrence standard is expansive and requires a logical relationship between the crossclaim and the original action or counterclaim"); SCHWARZER, TASHIMA & WAGSTAFFE, CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 8:1318 (Rule 13(g) permits crossclaims among claimants to a common fund).  Rule 13(g) crossclaims "are within the ancillary jurisdiction of the court and do not require an independent jurisdictional basis."  Jones v. Illinois Dept. of Rehabilitation Servs., 689 F.2d 724, 732 (7th Cir.

_____

[13] Additionally, the Court has subject matter jurisdiction under the minimal diversity requirements of the interpleader statute, 28 U.S.C. § 1335(a), because the value of the interpleaded funds is greater than $500 and at least two of the adverse claimants are of diverse citizenship.  28 U.S.C. § 1335(a).

1982); <u>Danner v. Himmelfarb</u>, 858 F.2d 515, 521 (9th Cir. 1988); 6 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 1433.

Venue is proper in the Central District of California because a substantial part of the events giving rise to the claim occurred in this district and a substantial part of the property that is the subject of the action is situated in this district.  28 U.S.C. § 1391.  Namely, Divens opened an account in the name of JDA at the Inglewood branch of Chase Investment Services Corporation in July 2009.  A substantial part of the interest income at issue in this dispute is held the CISC Account.

**B.    Standard of Review**

In an interpleader action, each claimant has the burden of establishing his or her right to the fund or property by a preponderance of the evidence.  7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 1714 & n.21; <u>Rhoades v. Casey</u>, 196 F.3d 592, 600 (5th Cir. 1999); <u>Napa Valley Bank v. Morgan</u>, No. Civ. S-90-1355MLS JFM, 1994 WL 720242, at *2 (E.D. Cal., Sept. 15, 1994.)  Betts and Gambles and Amedraa bear the burden of proving each element of their crossclaims by a preponderance of the evidence.  <u>See</u> Judicial Council of California Civil Jury Instruction 200.

**C.    The Interest Earned on the CMOs**

As stated above, both the interpleader action and the crossclaims asserted by Betts and Gambles and Amedraa relate to the interest earned on the Cobalt CMO and the FNMA Series CMO while the assets were in Divens's or JDA's possession.  The interpleader action relates to interest earned on the CMOs from November 2009 to April 2010, which is currently held in the CISC Account, whereas the crossclaims relate to the interest earned on the CMOs prior to November 2009, which Divens admittedly withdrew from various securities accounts and used for his personal benefit.  The parties assert identical legal arguments regarding their rights to the interest payments earned prior to November 2009 and their rights to the interest payments earned after November 2009.  Thus, to streamline the issues, the Court will discuss the parties' legal arguments related to the interpleader action and the crossclaims concurrently.

### 1.   Neither Divens Nor JDA Are Not Entitled to the Funds in the CISC Account

JDA asserts two principal arguments in support of its claim to the interest earned on the Cobalt CMO and the FNMA Series CMO.[14]  First, JDA argues that under Title 8 of the California Commercial Code, JDA became an "entitlement holder" with regard to the CMOs when the CMOs were transferred to various securities accounts controlled by JDA.  As an entitlement holder, JDA contends that it has a legal right to the accrued interest earned on the CMOs.  Second, JDA argues that it is entitled to the interest earned on the CMOs under a quantum meruit theory, as payment for its services in trying to place the CMOs into trading programs.  Because the second argument is less complicated, the Court addresses the latter argument first.[15]

---

[14] Divens does not contend that he personally is entitled to the funds held in the CISC Account.  Instead, Divens and JDA jointly argue that the funds belong to JDA.

[15] Divens and JDA assert two additional arguments, both of which can be summarily rejected.  First, JDA argues that it has viable claims for breach of contract against both Betts and Gambles and Amedraa, which entitle JDA to the accrued interest paid on the CMOs as damages.  JDA argues that it had contracts with both Betts and Gambles and Amedraa that authorized JDA to attempt to enter the Cobalt CMO and the FNMA Series CMO into trade programs.  JDA contends that Betts and Gambles and Amedraa frustrated the performance of those contracts by contacting CISC and claiming that the CMOs were stolen, thereby causing CISC to freeze the Account and preventing JDA from delivering the CMOs to a trade program that he had negotiated in September 2009.  (JDA/Divens's Post-Trial Br. at 7-8.)

JDA raised this argument in post-trial briefing submitted two weeks **after** the trial.  JDA has never asserted any crossclaims for breach of contract against Betts and Gambles or Amedraa and has not sought leave to amend its answer to assert such claims.  See Fed. R. Civ. Proc. 15(a)(2) (requiring leave of the Court to amend an answer more than 21 days after service).  Moreover, an amendment to add breach of contract claims at this stage would not conform to the proof presented at trial because JDA did not present any admissible evidence at trial that (1) it had executed agreements to trade the Cobalt CMO and the FNMA Series CMO; (2) that any such agreements failed because CISC froze the Account (and not for other reasons); or (3) that Divens suffered any damages.  Fed. R. Civ. Proc. 15(b); see In re Acequia, Inc., 34 F.3d 800, 814 (9th Cir. 1994) (amending the pleadings to conform to the proof at trial requires that evidence to support the new claim/issue was directly presented at trial and the new claim was "not merely inferentially presented by incidental evidence").  Thus, the Court declines to consider this argument.

Second, JDA objects to the Court hearing this interpleader action on the ground that both Amedraa and Betts and Gambles agreed to submit any disputes with JDA regarding the CMOs to arbitration.  However, JDA has not presented any evidence that an arbitration agreement exits between JDA and Betts and Gambles or between JDA and Amedraa.  (Notably, Amedraa is not a party to the March 2009 Agreement).  Thus, this argument indisputably fails.  Moreover, even if such arbitration agreements existed, JDA has waived its right to

### a.    JDA is Not Entitled to the Interest Under a Quantum Meruit Theory

JDA argues that the Court should award it the interest earned on the Cobalt CMO and the FNMA Series CMO under a quantum meruit theory as a payment for "the value of its services in attempting to place the CMOs in trade programs." (JDA's Post-Trial Br. at 8.)  This argument fails.

First, with regard to the Cobalt CMO, Betts and Gambles never authorized Divens or JDA to attempt to trade the Cobalt CMO.  JDA could not produce any valid written agreement between Betts and Gambles (or any representative thereof) and JDA authorizing JDA to trade the Cobalt CMO.  Further, the Court does not believe Divens's testimony that he had oral agreement with Betts and Gambles to trade the Cobalt CMO, especially in light of the fact that Betts and Gambles sent Divens at least **three written notices** stating that it had **not** authorized Divens or JDA to trade the Cobalt CMO.  Instead, JDA and Divens absconded with the Cobalt CMO and attempted to trade it without Betts and Gambles's knowledge or authorization, and over Betts and Gambles's strenuous objection.  To contend that JDA or Divens should be compensated for its purported trading services is absurd.

Furthermore, it is undisputed Betts and Gambles received no benefit from JDA's alleged attempts to trade the Cobalt CMO.  Thus, Divens cannot recover under a quantum meruit theory.  <u>Maglica v.</u>

---

arbitrate by participating in this lawsuit through trial, by failing to file a motion to compel arbitration at any time, and by failing to raise the issue of arbitration until the filing of a trial brief 4 days prior to the initial trial date and after the parties had completed discovery and engaged in substantial efforts to litigate the merits of the claims.  <u>See Cox v. Ocean View Hotel Corp.</u>, 533 F.3d 1114, 1119-21 (9th Cir. 2008) (challenges to enforcing arbitration clause on the grounds of waiver are for the court to decide); <u>United States v. Park Place Assoc., Ltd.</u>, 563 F.3d 907, 921 (9th Cir. 2009) (waiver may be found where party seeking arbitration had knowledge of an existing right to compel arbitration, took acts inconsistent with that right, and caused prejudice to the party opposing arbitration); <u>Van Ness Townhouses v. Mar Indust. Corp.</u>, 862 F.2d 754, 759 (9th Cir. 1988) (defendant waived his right to arbitrate where he "chose instead to litigate actively the entire matter-including pleadings, motions, and approving a pre-trial conference order"-and did not move to compel until more than 2 years after the complaint was filed); <u>Nat'l Foundation for Cancer Research v. A.G. Edwards & Sons, Inc.</u>, 821 F.2d 772, 777 (D.C. Cir. 1987) (appellant's "extended silence and much delayed demand for arbitration" evidenced a conscious decision to seek judicial judgment on the merits of the arbitrable claims; further, "substantial invocation of the litigation process . . . may cause prejudice and detriment to the opposing party.").

<u>Maglica</u>, 66 Cal. App. 4th 442, 450 (Ct. App. 1998) ("The idea that one must be *benefited* by the goods and services bestowed is thus integral to recovery in quantum meruit.") (emphasis in original); <u>see</u> <u>Palmer v. Gregg</u>, 65 Cal. 2d 657, 660-61 (1967) (plaintiff could not recover in quantum meruit where defendant received no direct benefit from plaintiff's actions).

With regard to the FNMA Series CMO, JDA entered an agreement with LNJ in March 2009 authorizing JDA to attempt to trade the FNMA Series CMO. However, the March 2009 Agreement contemplated that JDA would be paid for its efforts by receiving a share of the profits from the trading program. Nothing in the March 2009 Agreement contemplated that JDA would keep the interest accrued on the FNMA Series CMO as a payment for its services. Furthermore, it is undisputed that JDA was never able to successfully trade the FNMA Series CMO and that Amedraa never received any benefit from JDA's services. <u>See</u> <u>Palmer</u>, 65 Cal. 2d 660-61. Thus, there is no basis for JDA to recover in quantum meruit.[16]

**b.   JDA's Status as an Entitlement Holder**

JDA's next argument – that it is entitled to the interest earned on the CMOs by virtue of its status as an "entitlement holder" – requires an understanding of the nature of the CMOs and the indirect holding system. The Cobalt CMO and the FNMA Series CMO are not physical securities and are not represented by certificates. Rather, the CMOs are represented as "book entries" in a securities account and are governed by the rules relating to the indirect holding system in Revised Article 8 of the California Commercial Code. <u>See</u> Cal. Comm. Code § 8104, UCC official cmt. 1; Cal. Comm. Code § 8501, UCC official cmt. 4.

In the indirect holding system, a person acquires a security or an interest therein if the person acquires a "security entitlement" under Section 8501(b). Under § 8501(b), a security entitlement is created "if a securities intermediary . . . indicates by book entry that a

---

[16] Additionally, JDA did not present any evidence at trial of the specific efforts it took to trade the FNMA Series CMO or the reasonable value of its services.

financial asset has been credited to the person's securities account."[17] A "securities intermediary" is either a clearing corporation or any person, including a bank or broker, that in the ordinary course of business maintains securities accounts for others.  Cal. Comm. Code § 8102(a)(14).  In sum, once a securities intermediary indicates by book entry that a security has been credited to one's account, the account holder becomes an "entitlement holder" and acquires a securities entitlement against the securities intermediary.  Section 8102(a)(7).[18]

A securities entitlement is "a package of personal rights against the securities intermediary and an interest in the property held by the securities intermediary."  Section 8102, UCC official cmt. 17.  Part 5 of Revised Article 8 of the Commercial Code defines the rights of the entitlement holder and the duties of the securities intermediary.  Id. ("In a sense, then, the entirety of Part 5 is the definition of security entitlement.")  Chief among such rights, the securities intermediary must treat the entitlement holder as "entitled to the financial asset," Section 8501, UCC official cmt. 2, and ensure that the entitlement holder "receives all of the economic and corporate rights that comprise the financial asset."  Section 8503, UCC official cmt. 2; see Section 8505(a) (requiring the securities intermediary to take action to obtain any payments or distributions made by the issuer of the financial asset).  The entitlement holder's property interest with regard to the financial asset is only enforceable against the securities intermediary; the entitlement holder "cannot assert rights directly against other persons."  Section 8503(c), and UCC official cmt. 2.

JDA correctly contends that, in September 2009, when CISC indicated by book entries that the Cobalt CMO and the FNMA Series CMO were credited to the securities account in JDA's name, JDA became an entitlement holder with regard to the CMOs.  There is no dispute that CISC is a securities intermediary as defined in the California

---

[17] A "securities account" means an account "to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person from whom the account is maintained as entitled to exercise the rights that comprise the financial asset."  Cal. Comm. Code § 8501(a).

[18] All future section references are to the California Commercial Code unless otherwise indicated.

Commercial Code, and that the CMOs were indicated by book entry in a
CISC securities account in JDA's name.  Thus, CISC was obligated to,
and in fact did, obtain the interest income from the Cobalt CMO and the
FNMA Series CMO and credit it to JDA's securities account.  JDA makes
the same argument with regard to each of the securities accounts in
JDA's name in which the CMOs were held prior to September 2009 – i.e.,
that JDA became an entitlement holder when the financial institutions
indicated by book entry that the CMOs were credited to JDA's accounts.[19]

Although JDA clearly was an entitlement holder to the Cobalt CMO
and the FNMA Series CMO while the CMOs were held in its securities
accounts, JDA misunderstands the implications of this status.  JDA
contends that by virtue of its status as an entitlement holder it
acquired superior rights to those of the legal owners of the assets,
Amedraa and Betts and Gambles, and that it is not subject to any
adverse claims by such owners.  Under the circumstances of this case,
JDA is wrong.

### c.   JDA Held the CMOs In Trust for the Owners
### and Is Not a Purchaser for Value

Under California Commercial Code § 8502, an entitlement holder is
protected from adverse claims to the security entitlement only where
the entitlement holder acquires the security entitlement (1) for value
and (2) without notice of an adverse claim.[20]  The Court has not found
any case law discussing which party bears the burden of establishing
the requirements of Section 8502; however, under analogous provisions
regarding protected purchasers in the direct holding system, courts
generally agree that the burden to prove both elements is on the party
claiming protected purchaser status.  See Meadow Homes Development

---

[19] At trial, JDA did not present sufficient admissible evidence as to the
nature of the securities accounts in which the CMOs were held prior to the
CISC Account.  For example, JDA did not present evidence that the accounts
were in the name of JDA or that the institutions with which the accounts were
opened were securities intermediaries as defined in the Commercial Code.
Nonetheless, these points appear to be conceded by Amedraa and Betts and
Gambles.

[20] Section 8502 provides in its entirety: "An action based on a adverse claim
to a financial asset, whether framed in conversion, replevin, constructive
trust, equitable lien or any other theory many not be asserted against a
person who acquires a security entitlement under Section 8501 for value and
without notice of the adverse claim."

*Corp. v. Bowens*, 211 P.3d 743, 746 (Colo. Ct. App. 2009); *Hollywood Nat'l Bank v. Int'l Business Machines Corp.*, 38 Cal. App. 3d 607, 613 (Ct. App. 1974); *Young v. Kaye*, 279 A.2d 759, 764-66 (Pa. 1971) (reasoning that in the vast majority of cases it would be much easier for the holder of the security to prove that he is a bona fide purchaser than for an adverse claimant to prove otherwise; thus, the burden should be on the person claiming to be a bona fide purchaser); Section 8502, UCC official cmt. 1 (stating that Section 8502 plays an analogous role in the indirect holding system to the rule in the direct holding system that bona fide purchasers take securities free from adverse claims).  Thus, to defeat Betts and Gambles and Amedraa's claims to the interest earned on the CMOs, JDA must prove that it acquired the security entitlements for value and without notice of any adverse claims.  For the reasons stated below, JDA has not met this burden.

### i.   Value

Under the Commercial Code, a person gives value for rights if the person acquires such rights:

> (1) in return for a binding commitment to extend credit or for the extension of immediately available credit . . .;

> (2) as a security for, or in total or partial satisfaction of a preexisting claim;

> (3) by accepting delivery under a preexisting contract for purchase; or

> (4) in return for any consideration sufficient to support a simple contract.

Section 1204.  Here, it is clear that none of the first three requirements are met; JDA does not argue otherwise.  Instead, JDA argues that it obtained the Cobalt CMO and the FNMA Series CMO for value in exchange for its services in attempting to place the CMOs into trade programs.[21]  In short, JDA appears to contend that its trading services constitute "consideration sufficient to support a simple

---

[21] In its initial trial brief and during the bench trial, JDA made no argument and presented no evidence that it had acquired the CMOs for value.  JDA raised the above argument – i.e., that its services in attempting to place the CMOs into trading programs constitute value – for the first time in a responsive post-trial brief.

contract" in exchange for which Betts and Gambles and Amedraa conveyed the CMOs to JDA.

To constitute consideration sufficient to support a contract, it is not sufficient that a party simply confer a benefit or provide a service to the other party; rather, the performance of that service must be *bargained for*. RESTATEMENT (SECOND) CONTRACTS § 71 (1981); 1 Witkin, Summary of California Law: Contracts § 204, p. 238 (10th ed. 2005) ("The act or forbearance must be something bargained for in exchange for the offeror's promise; i.e., it is immaterial what detriment the offeree suffered or what benefits he or she may have conferred on the offeror, unless the offeror agreed to be bound in return."). A performance or promise to perform by Party A is bargained for only if (1) it is **sought by** Party B in exchange for Party B's promise to perform and (2) is given by Party A in exchange for Party B's promise. REST. 2D CONTRACTS § 71; E. ALLEN FARNSWORTH, CONTRACTS § 2.2 (3d ed. 1999). An action is not bargained for and cannot constitute consideration for a promise if it was wholly unsolicited by the promisor. FARNSWORTH, CONTRACTS § 2.9; <u>Patel v. American Bd. Of Psychiatry & Neurology</u>, 975 F.2d 1312 (7th Cir. 1992) (Posner, J.) ("Unbargained detriments are relevant not to contracts . . . ."); <u>see</u>, <u>e.g.</u>, <u>Bard v. Kent</u>, 19 Cal. 449 (1942) (lessee provided no consideration for an option to extend the lease where the lessee spent money for architect's drawings of proposed improvements on the property but the lessor/offeror had not agreed to accept these acts as consideration).

### a.   The Cobalt CMO

Here, there is no evidence (other than Divens's wholly incredible testimony) that Betts and Gambles ever sought JDA's services to attempt to trade the Cobalt CMO. Instead, Betts and Gambles transferred the Cobalt CMO to Divens to hold in trust as an escrow agent for a pending sale of the Cobalt CMO to Up Right Holdings. When the proposed sale fell through, Betts and Gambles demanded return of the Cobalt CMO.

Several facts demonstrate that Betts and Gambles never bargained for Divens's or JDA's trading services.[22] First, Betts and Gambles sent

---

[22] The Court uses the term "trading services" to refer to JDA's and Divens's services in attempting to facilitate or arrange the placement of the Cobalt CMO into a trading platform. The Court recognizes that JDA and Divens do not actually trade CMOs.

31

numerous letters to Divens indicating that it had **never** authorized Divens to trade the Cobalt CMO and demanding the CMO's return.  (See, e.g., Tr. Exh. 110, March 6, 2009 letter from Roberson to Divens ["BGI's only obligation was to deliver the CMO to the securities escrow account . . ., such delivery being conditioned upon payment of the purchase price by the agreed date. . . . [Betts and Gambles] has never given its consent to the investment of its CMO into any such [trading] platform, and is entitled to the immediate return of the CMO."].)  Second, Divens hid his attempts to trade the Cobalt CMO from Betts and Gambles.  Divens absconded with the Cobalt CMO and transferred it to several different accounts without Betts and Gambles' knowledge or authorization.  Betts and Gambles made repeated attempts to get in touch with Divens, but Divens refused to have any contact with Betts and Gambles after March 2009, when Divens was purportedly attempting to trade the Cobalt CMO.  Further, while Divens was attempting to trade the Cobalt CMO, Betts and Gambles obtained a civil judgment against Divens for theft of the Cobalt CMO.

JDA or Divens may very well have attempted to trade the Cobalt CMO.  But such attempts were done solely for Divens's own benefit and were never authorized, agreed to, or otherwise bargained for by Betts and Gambles.  As such, JDA's trading services cannot constitute consideration for the transfer of the Cobalt CMO.  JDA has not shown that it acquired the Cobalt CMO for value.

### b.   The FNMA Series CMO

JDA's argument that it acquired the FNMA Series CMO for value also fails.  In January 2009, LNJ, acting on behalf of Amedraa, delivered the FNMA Series CMO to JDA's securities account to hold in escrow pending a payment from third-party WGI.  WGI failed to make the required payment, and JDA breached the Escrow Agreement by refusing to return the FNMA Series CMO.  JDA only obligation under the Escrow Agreement was to hold the FNMA Series CMO in trust for the owner pending payment from a third party.  JDA did not provide any value in exchange for the transfer of the FNMA Series CMO.[23]

---

[23] To the extent that one could argue that JDA's escrow services constitute value in exchange for the FNMA Series CMO, that argument is defeated by the language of the Escrow Agreement itself.  The Escrow Agreement expressly provides that JDA's escrow fees would be paid by directly by WGI, not by LNJ

Two months later, in March 2009, LNJ entered into an agreement with JDA to allow JDA and Matrix Holdings to trade the FNMA Series CMO. JDA contends that the services it provided pursuant to this March 2009 Agreement constitute consideration for the transfer of the FNMA Series CMO.[24]  The principal flaw in JDA's argument is that it ignores what the parties actually bargained for by way of the March 2009 Agreement.  The Agreement expressly provides that JDA and Matrix Holdings had arranged to have the FNMA Series CMO placed in a lucrative investment/trading program and that JDA and Matrix would be responsible for distributing the profits from the trading program.  In return for these services,

---

and not from any proceeds generated from the FNMA Series CMO.  Thus, JDA did not bargain for the FNMA Series CMO in exchange for its escrow services.

[24] At trial, Amedraa argued that LNJ's consent to the March 2009 Agreement was not voluntary because Wilde and Divens coerced LNJ into entering the agreement by threatening not to return the FNMA Series CMO unless LNJ agreed to a trade deal.  Curiously, however, Amedraa has not asked the Court to rescind the March 2009 Agreement as the product of duress.  Cal. Civ. Code § 1566 (where consent to a contract is obtained by duress, the contract is voidable by the coerced party, but not automatically void); see 1 WITKIN, SUMMARY OF CALIFORNIA LAW: CONTRACTS § 310, p. 336 (10th ed. 2005).  Nonetheless, even had Amedraa made such a request, the defense of duress cannot be met on these facts.

Economic duress requires both (1) a coercive wrongful act, and (2) that the subject of the coercive act had no reasonable alternative but to succumb to the coercion.  See Rich & Whilliock, Inc. v. Ashton Development, Inc., 157 Cal. App. 3d 1154, 1158-59 (Ct. App. 1984); Johnson v. Int'l Business Machines Corp., 891 F. Supp. 522, 528-30 (N.D. Cal. 1995).  The latter requirement is most often found where the coerced party's only alternative is bankruptcy or financial ruin.  Rich & Whilliock, Inc., 157 Cal. App. 3d at 1158; Sheehan v. Atlanta Int'l Ins. Co., 812 F.2d 465, 469 (9th Cir. 1987).

Here, while Amedraa (through its agent LNJ) was the subject of a coercive threat, the Court cannot conclude that Amedraa had no reasonable alternative but to enter into a trading contract with JDA and Matrix Holdings.  The Court has no evidence regarding Amedraa's financial condition in March 2009, nor is there any reason to believe that the failure to enter into the March 2009 Agreement would result in Amedraa's financial ruin.  Further, Amedraa likely could have pursued legal remedies, such as a civil action for conversion, to protect its rights against Divens's threatened detention of the FNMA Series CMO.  See Nesbitt Fruit Prods. Inc. v. Del Monte Beverage Co., 177 Cal. App. 2d 353, 360-61 (Ct. App. 1960) (holding that a party "is expected to use any available legal remedies adequate to protect his rights against the threatened wrong"); London Homes, Inc. v. Korn, 234 Cal. App. 2d 233 (Ct. App. 1965)(duress defense not valid where at the time of the alleged coercive act, "the plaintiff could have brought suit against [defendants] for damages, but for what appeared to them to be good business reasons, they elected not to do so."); Johnson, 891 F. Supp. at 529 (duress not met where plaintiff had several alternatives to signing a release agreement presented by his employer and there was no evidence that failure to do so would result in his financial ruin).  On this record, the Court cannot conclude that Amedraa lacked a reasonable alternative to signing the March 2009 Agreement; thus, the contract was not created under duress.

LNJ[25] agreed to split the profits from the trading program with JDA and Matrix Holdings.  Thus, what JDA bargained for, and what induced JDA to provide its services, was LNJ's promise to split the profits of the trading program with JDA.  <u>See</u> Rest. 2d. Contracts § 71, cmt. b. (noting the reciprocal relationship of motive or inducement between the consideration and the promise: "the consideration induces the making of the promise and the promise induces the furnishing of the consideration.")

Although LNJ agreed to deliver the FNMA Series CMO to JDA, such delivery was merely incidental to the contract.  LNJ never agreed to allow JDA to keep the interest earned on the FNMA Series CMO, nor JDA did not expect to keep the interest payments in exchange for its services.  In fact, the March 2009 Agreement expressly states that LNJ shall "remain the sole legal and beneficial owner of the CMO at all times during the term of this Agreement" and that, at the conclusion of the term, "the CMO shall be returned free and clear and unencumbered" to LNJ.  Further, in written communications in March 2009, Divens expressly promised Savor that JDA would pay LNJ all of the interest earned on the FNMA Series CMO while it was in JDA's possession.  (Tr. Exh. 22 [In response to Savor's demand for the interest earned on the FNMA Series CMO since January 2009, Divens wrote, "we have every intention of paying you every dime earned on your CMOs."].)  The parties' intentions are clear – JDA was to be compensated for its services by the profits earned from the trade, not by the interest earned on the FNMA Series CMO.  Thus, JDA did not provide any value *in exchange for* the rights to the financial benefits (i.e., the interest stream) of the FNMA Series CMO.

In sum, JDA is not protected from adverse claims under Section 8502 as to either the Cobalt CMO or the FNMA Series CMO because it did not provide any value in exchange for the security entitlements to these CMOs.

## 2.   Notice of Adverse Claims

Section 8502 does not shield JDA from liability for an additional reason: JDA had notice of Betts and Gambles's and Amedraa's adverse

---

[25] LNJ was acting at all relevant times as the agent for Amedraa, LLC, the owner of the FNMA Series CMO.

34

claims to the CMOs prior to acquiring security entitlements with CISC and other financial institutions.

An "adverse claim" means a claim that a claimant has a property interest in a financial asset, such as an ownership interest, and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset.  Section 8102(1). One has notice of an adverse claim if (1) the person actually knows of the claim, or (2) the person is willfully blind to the claim – that is, the person knows of sufficient facts to indicate that there is a significant probability that an adverse claim exists and deliberately avoids information that would establish the existence of the claim. Section 8105(a).  Additionally, where a financial asset is being held by a representative on behalf of an owner and the asset is transferred to a third party, the transferee knows of an adverse claim if the transferee knows that the proceeds of the transaction are being used for the individual benefit of the representative or that the transfer is in breach of the representative's duty.  Section 8105(b).

### a.   Cobalt CMO

Betts and Gambles delivered the Cobalt CMO to JDA's UBS Account on February 3, 2009.  Contrary to JDA's argument otherwise, the Cobalt CMO was not "freely delivered" to JDA; it was delivered into the UBS Account to be held in escrow pending a proposed sale of the Cobalt CMO to Up Right Holdings.  Divens testified that within a week or a month of delivery of the Cobalt CMO into JDA's UBS Account, Divens knew that Betts and Gambles was the true owner of the Cobalt CMO.

On March 6, 2009, counsel for Betts and Gambles, Derek Roberson, wrote a letter to Divens confirming that Betts and Gambles had delivered the Cobalt CMO to Divens to be held in escrow pending Up Right Holding's payment of the purchase price for the Cobalt CMO. Roberson wrote that Up Right Holdings was unable to pay the agreed upon purchase price and that Betts and Gambles demanded immediate return of the Cobalt CMO.  (Tr. Exh. 110).  Divens does not dispute that he received this letter on or about March 6, 2009.  Further, "it is established law that on failure of escrow the funds deposited with the escrow holder are returnable to the respective depositors."  Crooks v. State Bar of California, 3 Cal. 3d 346, 357 (1970).  Thus, as of March

6, 2009, Divens and JDA had actual knowledge that Betts and Gambles had an ownership interest in the Cobalt CMO and that it would be a violation of Betts and Gambles's rights for JDA or Divens to continue to hold or transfer the Cobalt CMO.

After March 6, 2009, Divens transferred the Cobalt CMO to accounts in JDA's name at five different financial institutions: Smith Barney, Capstone, Asset Enhancement Management, Matrix, and CISC.  Each of these transfers was made after JDA had notice of Betts and Gambles's adverse claim.  Thus, Section 8502 does not protect JDA's securities entitlements from Betts and Gambles's adverse claims.

### b.   FNMA Series CMO

LNJ transferred the FNMA Series CMO to the JDA UBS Account on or about January 5, 2009.  At all relevant times, Divens (and therefore JDA) knew that Amedraa, through its agent LNJ, asserted an ownership interest in the FNMA Series CMO.[26]  Nonetheless, Amedraa (through its agent LNJ) initially consented to JDA holding the FNMA Series CMO.  Amedraa authorized JDA to hold the FNMA Series CMO in January 2009, when JDA acted as an escrow agent in connection with LNJ's contract with WGI, and then again in March 2009 when it authorized LNJ to enter into an agreement with JDA to enter the FNMA Series CMO into a trading program.

By April 2009, however, JDA had breached the March 2009 Agreement with LNJ.  JDA never entered the FNMA Series CMO into a trading program and never made any of the required payments due to LNJ under the March 2009 Agreement.  The March 2009 Agreement expressly grants LNJ the right to recall the FNMA Series CMO if JDA fails to timely make a required payment to LNJ.  On April 14, 2009, LNJ exercised its recall rights.  LNJ sent JDA a formal notice recalling the FNMA Series CMO and providing wiring coordinates for its return.  Divens does not dispute that he received the April 14, 2009 notice.  Thus, as of April 14, 2009, JDA had notice that it would be a violation of Amedraa's rights for JDA to continue to hold, transfer, or otherwise deal with the FNMA Series CMO.  See Section 8102(a), UCC official cmt. 1 (an adverse claim

---

[26] See Tr. Exh. 14 (Letter from Evelyn Aardema to Jon Divens indicating that Amedraa is the owner of the FNMA Series CMO and that LNJ was acting as Amedraa's agent in attempting to negotiate the placement of the FNMA Series CMO in various trading programs.)

may be based on the right "to rescind the transaction in which securities were transferred."); Multimedia 2000, Inc. v. Attard, 374 F.3d 377, 381 (6th Cir. 2004).

Although the timeline is less than clear, it appears that JDA transferred the FNMA Series CMO to at least four different securities accounts after April 14, 2009, including accounts at Smith Barney, Capstone, Matrix, and the CISC Account.   Each of these transfers was made after JDA knew of Amedraa's adverse claim; thus, Section 8502 does not protect these securities entitlements from adverse claims.

JDA contends, however, that Betts and Gambles's and Amedraa's claims do not qualify as "adverse claims" within the meaning of Section 8502.   (JDA's Post Trial Brief at 5.)   Relying on one of the official comments to Section 8102(a)(1) (the definition of the term "adverse claim"), JDA argues that Betts and Gambles and Amedraa's claims are simply breach of contract claims – i.e., claims that JDA and Divens breached the relevant escrow agreements and the March 2009 Agreement by retaining the CMOs – and breach of contract claims do not meet the definition of adverse claims.   JDA misinterprets the applicable law.

UCC official comment 1 to Section 8102 clarifies that the definition of an adverse claim is limited to property interests (including ownership interests), and does not extend to any and all wrongful actions concerning securities.   Thus, the official comment expressly rejects the holding in two cases, Fallon v. Wall Street Clearing Corp., 586 N.Y.S. 2d 953 (1992) and Pentech Int'l v. Wall Street Clearing Co., 983 F.2d 441 (2d Cir. 1993), in which the courts held that a breach of a contract to pledge or sell a security constituted an adverse claim.   While the specific facts of Pentech and Wall Street are complicated, the overall structure of each case is simple: Party A entered into contracts through which it assigned certain interests in securities to various parties ("the Claimants").   Thereafter, Party A breached those contracts by selling/transferring the securities to Party B.   It was undisputed that Party B knew of the Claimants contractual interests prior to the transfer.   The Claimants asserted adverse claims against Party B, arguing that because Party B had knowledge of the Claimants' contractual rights prior to the transfer, Party B took the securities subject to the Claimants'

interests.   The courts in <u>Fallon</u> and <u>Wall Street</u> agreed with the Claimants.

In rejecting the holdings of <u>Fallon</u> and <u>Wall Street</u>, the official comment to Section 8102(a)(1) explains that, in a situation where A contracts to sell securities to B, but instead pledges the securities to C, B has an action against A for breach of contract, but absent "unusual circumstances," the breach does not give rise to a property interest in the securities.   Thus, the definition of "adverse claim" seeks to exclude the situation where the claimant does not have any right to the security other than by way of his or her contract with the defendant – in other words, where the claimant does not have an existing property interest in the security.   Here, however, such exclusion does not apply.   Betts and Gambles and Amedraa each purchased the Cobalt CMO and the FNMA Series CMO, respectively, prior to any dealings with JDA and Divens.   Unlike the Claimants in <u>Fallon</u> and <u>Wall Street</u>, Betts and Gambles and Amedraa had existing ownership rights to the CMOs which were not created by virtue of the contracts with JDA and Divens.   Thus, because Betts and Gambles and Amedraa had existing property interests in the CMOs, their claims meet the definition of an adverse claim under Section 8102(a)(1).

In sum, JDA's security entitlements in the Cobalt CMO and the FNMA Series CMO are not protected against adverse claims under Section 8502 because JDA did not provide any value in exchange for the CMOs. Further, JDA took such security entitlements with knowledge of Betts and Gambles's and Amedraa's adverse claims.   Having concluded that JDA took its securities entitlements subject to adverse claims, the Court turns to Betts and Gambles's and Amedraa's claims to the interest earned on the Cobalt CMO and the FNMA Series CMO.[27]

### 2.   Betts and Gambles Is Entitled to the Interest Earned on the Cobalt CMO

It is undisputed that Betts and Gambles is, and at all relevant times was, the owner of the Cobalt CMO.   Betts and Gambles entrusted the Cobalt CMO to Divens to hold in escrow pending a sale of the CMO to a third party.   When the sale fell through, Betts and Gambles demanded

---

[27] Divens and JDA have not asserted any legal defenses to the affirmative claims plead by Betts and Gambles and Amedraa, other than to argue that as an entitlement holder JDA is shielded from any liability under Section 8502.

return of the Cobalt CMO, but Divens refused.  Divens admits that he transferred the Cobalt CMO to several different financial institutions from February to November 2009 and withdrew the interest earned on the Cobalt CMO for his personal needs.  In November 2009, the Cobalt CMO and the incoming interest payments were frozen in the CISC Account.  On the basis of these facts, Betts and Gambles assert claims against Divens[28] for money had and received and for an accounting.[29]

### a.  Accounting

An action for an accounting is an equitable action that lies to compel the defendant to account to the plaintiff for money or property.  See 5 WITKIN, CALIFORNIA PROCEDURE: PLEADING § 819, p. 236 (5th ed. 2008).  The action is only appropriate where the balance due from the defendant to the plaintiff is unknown and cannot be ascertained by way of a calculation.  Teselle v. McLoughlin, 173 Cal. App. 4th 156, 178 (Ct. App. 2009); St. James Church of Christ Holiness v. Superior Court, 135 Cal. App. 2d 352, 359 (1955).  Such is not the case here.  Betts and Gambles has produced uncontroverted evidence showing the exact amount of interest earned on the Cobalt CMO each month from February 2009 to April 2010.  Further, Divens admitted that he withdrew all of the interest earned through October 2009 and used it for his personal needs; the remaining interest earned from November 2009 onward is held in the CISC Account.  Thus, an action for accounting is not appropriate.  Betts and Gambles appears to concede as much.  (See Betts and Gambles's Memo. Of Contentions of Fact and Law at 10 [Docket No. 99].)

### b.  Money Had and Received

An action for money had and received is a form of common count.  It is an action at law, but it is governed by principles of equity.  Mains v. City Title Ins. Co., 34 Cal. 2d 580, 586 (1949).  To establish

---

[28] Betts and Gambles has pled claims against both Divens and JDA; however, the testimony received at trial (through the Declaration of Mr. Betts) indicates that the oral escrow agreement pursuant to which Betts and Gambles transferred the Cobalt CMO to Divens was made with Divens personally – that is, Jon Divens was to act as the escrow agent.  Further, Divens personally misappropriated the interest earned on the Cobalt CMO for his own use.  Thus, the claim appears to be against Divens in his individual capacity.

[29] Although Betts and Gambles has not pleaded a cause of action for conversion, the facts proved at trial are sufficient to meet all the elements of a conversion claim as well.  See infra Section III.3.C.

the action, plaintiff must prove: (1) that defendant received money that was intended to be used for the benefit of plaintiff; (2) that the money was not used for the benefit of plaintiff; and (3) that defendant has not given the money to plaintiff.  Judicial Council of California, California Civil Jury Instructions (CACI) 370 (updated through February 2010 Supp.).  As the California Supreme Court explained: "The action for money had and received is based upon an implied promise which the law creates to restore money from which the defendant in equity and good conscience should not retain.  The law implies the promise from the receipt of they money to prevent unjust enrichment."  Rotea v. Izuel, 14 Cal. 2d 605, 611 (1939), *disapproved of on other grounds by* Earhart v. William Low Co., 25 Cal. 3d 503, 506 (1979); see J.C. Peacock, Inc. v. Hasko, 196 Cal. App. 2d 353, 361 (1961) ("It is well established in our practice that an action for money had and received will lie to recover money paid by mistake, undue duress, oppression or where an undue advantage was taken of plaintiff's situation whereby money was exacted to which defendant had no legal right.").

In Kalashian v. Krebs, Case No. G032397, 2004 WL 2700618 (Ct. App., Nov. 29, 2004), the California Court of Appeal upheld an action for money had and received on somewhat analogous facts.  In Kalashian, Mona Krebs and Ronald Krebs ("the Krebses") agreed to sell 100 percent of the stock in a company they owned, Mark Data Products, Inc., to Connecting Point Computers, LLC ("the LLC").  Id. at *1.  Michael Kalashian and his wife Vita Kalashian were the sole members of the LLC. The Krebses also had a business bank account at Wells Fargo of over $1 million dollars, which contained their life savings, and which was agreed to remain the Krebses's property following completion of the stock purchase.  Id.  The sale was completed, and after escrow closed, the Kalashians became the officers of Mark Data Products.  Id.  The Kalashians then signed documents at Wells Fargo to have the Krebses removed as signatories on the Wells Fargo business account and to have themselves substituted as signatories.  Id. at *7.  Thereafter, Michael Kalashian made two transfers out of the Wells Fargo account totaling over $1.575 million and transferred such funds to an account held by the LLC.  Id.  The Kalashians used the money from the LLC account to pay their personal bills.  Id.

At trial, the jury found in favor of the Krebses and awarded them $1.575 million on their action for money had and received.  Id. at *2. The appellate court affirmed.  Id.  The appellate court held that the essential elements of the claim had been met because: (1) the Krebses produced evidence that they owned the Wells Fargo business account and that they retained such ownership after the close of the stock sale; (2) the Kalashians admittedly withdrew $1.575 million from the account and used it for their own benefit; and (3) neither the Kalashians nor the LLC returned the money.  Id. at *7.  In sum, the Kalashians had in their possession money which in fairness should be paid to the Krebses; thus, the law imposed an obligation to do so.  Id. at *7.

Here, there is sufficient evidence to establish a claim for money had and received against Divens.  First, Betts and Gambles proved that it is, and at all relevant times was, the owner of the Cobalt CMO. Divens did not purchase the Cobalt CMO nor did he provide any value in exchange for the transfer of the Cobalt CMO to him.  Instead, Divens was given the Cobalt CMO to hold in escrow pending Up Right Holding's payment of an advance to purchase the Cobalt CMO from Betts and Gambles.[30]  As such, Divens became Betts and Gambles's agent as to the Cobalt CMO pending the close of escrow; Betts and Gambles retained ownership to the Cobalt CMO until the conditions of escrow – i.e., the receipt of the payment from Up Right Holdings – were performed.  Kelly v. Steinberg, 148 Cal. App. 2d 211, 217-18 (1957).[31]

---

[30] There is no requirement that an escrow agreement be in writing.  Kelly v. Steinberg, 148 Cal. App. 2d 211, 216 (Ct. App. 1957).  Escrow is any transaction in which one person, for the purpose of effecting the sale of property to another person, "delivers any written instrument, money, evidence of title to real or personal property or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person to a grantor."  Id. at 217 (citing Cal. Fin. Code § 17003.)

Although Betts and Gambles did not have a written escrow agreement with Divens, the evidence produced at trial, including but not limited to the Declaration of Seth Betts and the March 6, 2009 letter from Roberson to Divens, is sufficient to prove that an escrow agreement existed and that Divens was to hold the Cobalt CMO pending the receipt of an advance payment by Up Right Holdings.

[31] This escrow relationship is not altered by the fact that the asset at issue was a security transferred in the indirect holding system.  The California Commercial Code expressly recognizes that an entitlement holder "may be acting for another person as a nominee, agent, trustee, or in another capacity." Section 8102, UCC official cmt. 7.  Where the entitlement holder is not itself a securities intermediary, as is the case here, "the relationship between an

It is undisputed that Up Right Holdings was not able to make the required advance payment to purchase the Cobalt CMO, and that on March 6, 2009, Betts and Gambles demanded that Divens return the Cobalt CMO. Divens had an absolute duty to return the Cobalt CMO upon failure of the escrow.  Id. at 218 ("It is the duty an escrow holder to protect the buyer by . . . returning [the escrow funds] to him on failure of the prescribed event."); Crooks v. State Bar of California, 3 Cal. 3d 346, 357 (1970) ("It is established law that on failure of escrow the funds deposited with the escrow holder are returnable to the respective depositors."); see also Virtanen v. O'Connell, 140 Cal. App. 4th 688, 707-08 (Ct. App. 2006) (escrow agent liable in conversion where he refused to return stock certificates to seller when the conditions of the sale agreement had not been met and seller demanded return of the certificates).

Divens admittedly retained the Cobalt CMO and the interest earned therefrom for his personal benefit.  After the escrow failed, Divens refused to respond to Betts and Gambles's repeated demands that the CMO be returned and instead absconded with the asset, moving it several times so that Betts and Gambles could not locate it.  Although Divens eventually returned the Cobalt CMO to Betts and Gambles in April 2010, he never paid Betts and Gambles any of the interest the CMO had earned while it was in his possession.  See Utility Audit Co. v. City of Los Angeles, 112 Cal. App. 4th 950 (2003) (where City of Los Angeles refunded sewage fees paid by Los Angeles residents who had erroneously been charged, but refused to pay interest earned on such fees, residents had a valid claim against the City for money had and received).  Like the plaintiffs in Kalashian, Divens transferred the interest from the Cobalt CMO out of the various securities accounts where it was held and used the interest for his personal needs.

In sum, Betts and Gambles has established (1) that it owned the Cobalt CMO and that Divens received interest payments from the Cobalt CMO which were for Betts and Gambles's benefit; (2) that Divens took the interest and used it for his personal benefit; and (3) that Divens

entitlement holder and another person for whose benefit the entitlement holder holds a securities entitlement is governed by other law," not the Commercial Code.  Id.

refused to return such interest.  Equity demands that the interest earned on the Cobalt CMO be returned to Betts and Gambles.

### c.  Relief

The measure of liability in an action for money had and received is the amount received by the defendant.  <u>Rotea v. Izuel</u>, 14 Cal. 2d 605, 611 (1939).  In total, Divens received $241,980.43 in interest earned on the Cobalt CMO from February 2009 to October 2009.  From November 2009 to April 2010, the interest that Divens received from the Cobalt CMO has been held in the CISC Account controlled by Divens and JDA, which is the subject of the present interpleader action.  The parties have stipulated that 69% of the funds currently held in the CISC Account are attributable to interest earned on the Cobalt CMO.[32] Thus, the Court awards Betts and Gambles a judgment against Divens in the amount of $241,980.43.  Further, the Court orders that CISC pay to Betts and Gambles 69% of the interpleaded funds currently held in the CISC Account.

### 3.  Amedraa Is Entitled to the Interest Earned on the Amedraa CMO

Amedraa has asserted claims against Divens and JDA for conversion, money had and received, and for an accounting.  Because the conversion claim is valid and allows for the relief requested by Amedraa, the Court need not address the remaining claims.

### a.  Conversion

"Conversion is the wrongful exercise of dominion over the property of another." <u>Burlesci v. Peterson</u>, 68 Cal. App. 4th 1062, 1066 (Ct. App. 1998); <u>Virtanen v. O'Connell</u>, 140 Cal. App. 4th 688, 707 (Ct. App. 2006).  The elements of a conversion claim are: (1) that the plaintiff owns or has a right to possess the property at issue; (2) that the defendant intentionally prevented the plaintiff from having access to the property for a significant period of time, refused to return the property upon plaintiff's demand, or otherwise wrongfully disposed of the property; (3) that the plaintiff did not consent, and (4) damages. <u>Burlesci</u>, 68 Cal. App. 4th at 1066; <u>Enterprise Leasing Corp. v. Shugart</u>

---

[32] As of April 30, 2010, the balance in the CISC Account was $235,086.18.  The Court is not aware of the exact balance in the CISC Account as of the date of this Order.

<u>Corp.</u>, 231 Cal. App. 3d 737, 748 (Ct. App. 1991); <u>see</u> Judicial Council of California Civil Jury Instruction 2100.

Conversion is a strict liability tort. <u>Burlesci</u>, 68 Cal. App. 4th at 1066.  Thus, while the act constituting the conversion must be intentionally done – that is, the defendant must intend to assert dominion over the property – the defendant's good faith or lack thereof is immaterial.  <u>See</u> <u>id.</u> at 1067 ("The general rule is that 'the foundation of the action . . . rests neither in the knowledge nor the intent of the defendant.  It rests upon the unwarranted interference by defendant with dominion over the property of the plaintiff from which injury to the latter results.") (quoting <u>Poggi v. Scott</u>, 167 Cal. 372, 375 (1914)); <u>Enterprise Leasing Corp.</u>, 231 Cal. App. 3d at 748 ("[The] defendant's good faith, ignorance, mistake or motive is irrelevant and does not constitute a defense.").  The fact that defendant actually believes (incorrectly) that he is entitled to the property is not a defense.  <u>Burlesci</u>, 68 Cal. App. 4th at 1067.

A conversion action may lie against a defendant who unjustifiably refuses to return the property on demand, even where the defendant originally obtained possession of the property lawfully.  <u>See</u>, <u>e.g.</u>, <u>Cerra v. Blackstone</u>, 172 Cal. App. 3d 604, (Ct. App. 1985) (defendant car dealer was liable in conversion where dealer lawfully repossessed a vehicle from plaintiff but later refused to allow plaintiff to reinstate the sales contract by paying the past due amount); <u>Virtanen</u>, 140 Cal. App. 4th at 707 (attorney escrow holder liable in conversion when he delivered the stock certificates held in escrow to buyer before the conditions of escrow were met and after seller had rescinded the sale agreement).  Further, the plaintiff may bring an action for damages resulting from the conversion even if the plaintiff has regained possession of the property prior to trial.  <u>Enterprise Leasing Corp.</u>, 231 Cal. App. 3d at 748 ("In a conversion action, the plaintiff need only show that he was entitled to possession at the time of conversion; the fact that plaintiff regained possession of the converted property does not prevent him from suing for damages for the conversion.").

Here, Amedraa has presented sufficient facts to prove a conversion claim against Divens and JDA.  First, Amedraa proved that it purchased

the FNMA Series CMO (and the corresponding right to receive the interest stream therefrom) in July 2008 and has owned the FNMA Series CMO since that time.  Divens does not dispute that, at all relevant times, Amedraa owned the FNMA Series CMO.

Although Amedraa (through its agent LNJ) authorized JDA to hold the FNMA Series CMO at various points in 2009, it never authorized JDA or Divens to keep the interest earned on the FNMA Series CMO.  Instead, JDA held the FNMA Series CMO as an agent and on behalf of LNJ.[33]  JDA first obtained the FNMA Series CMO in January 2009 pursuant to a written Escrow Agreement.  The Escrow Agreement provided that JDA would act solely as an escrow agent in connection with a trade agreement between LNJ and WGI.  JDA's only obligation was to hold the FNMA Series CMO in escrow until such time as LNJ received an advance payment from WGI in the amount of 1% of the face value of the FNMA Series CMO, and then deliver the FNMA Series CMO to WGI.  As an escrow agent, JDA owed a fiduciary duty to LNJ to strictly comply with the escrow instructions, and to return the FNMA Series CMO to LNJ if WGI failed to make the advance payment.  Kelly v. Steinberg, 148 Cal. App. 2d 211, 217-18 (1957); Virtanen, 140 Cal. App. 4th at 707.  Amedraa retained its ownership interest in the FNMA Series CMO while it was in escrow. See Kelly, 148 Cal. App. 2d at 218.

In March 2009, LNJ entered into an agreement with JDA authorizing JDA to attempt to enter the FNMA Series CMO into a trading program. Although the March 2009 Agreement granted JDA the right to hold the FNMA Series CMO in connection with its efforts to place the asset into trade, LNJ never authorized JDA to retain the interest payments earned on the FNMA Series CMO.  In fact, the March 2009 Agreement expressly recognizes that LNJ would remain the **"sole legal and beneficial"** owner of the FNMA Series CMO at all times during the term of the Agreement. (Tr. Exh. 20 [March 2009 Agreement], ¶ 3.) (emphasis added).  The only reasonable interpretation of this clause is that LNJ retained its rights to receive the benefits of the FNMA Series CMO – i.e., the monthly interest payments generated from the asset – through the duration of the agreement.  Furthermore, less than two weeks after the

---

[33] As stated above, LNJ was acting at all relevant times as an agent of Amedraa with regard to the FNMA Series CMO.

March 2009 Agreement was executed, JDA promised to pay to LNJ all the
interest earned on the FNMA Series CMO while the CMO was in JDA's
possession, from January to March 2009.  (Tr. Exh. 22.)  This evidence
indicates that, notwithstanding the March 2009 Agreement, at all
relevant times Amedraa (acting through its agent LNJ) retained its
rights to the interest earned on the FNMA Series CMO.[34]

JDA unlawfully retained possession of the FNMA Series CMO in
violation of its agreements with LNJ and despite numerous demands for
the CMO's return.  In late January 2009, the escrow arrangement failed.
WGI did not make the required advanced payment to LNJ and indicated
unequivocally that it would not be able to do so.  Thus, in February
2009, LNJ and Amedraa made no less than _five_ written demands (and
several oral demands) that JDA and Divens return the FNMA Series CMO
and the interest earned therefrom to LNJ.  Divens refused to return the
FNMA Series CMO.  Instead, Divens transferred the FNMA Series CMO to
several different financial institutions so that LNJ could not locate
it.  Without LNJ or Amedraa's knowledge or consent, Divens then
transferred the interest payments earned on the FNMA Series CMO out of
the accounts where the asset was held and used the money for his
personal benefit.

On March 25, 2009, Savor wrote to Divens via email again demanding
that JDA pay LNJ the interest earned on the FNMA Series CMO while it
had been in JDA's possession.  Divens agreed on behalf of JDA to make
such payments, but never did.

At the end of March 2009, JDA had breached the March 2009
Agreement with LNJ.  JDA did not make the required payments due to LNJ
under the Agreement.  JDA's default gave rise to LNJ's right to recall
the Amedraa CMO.  On April 14, 2009, LNJ wrote a letter to Divens
indicating that it was exercising its rights under the March 2009
Agreement to recall the FNMA Series CMO and demanding that JDA return
the CMO to LNJ.  Divens once again refused.  After mid-April 2010,
Divens stopped returning all phone calls and other correspondence from
LNJ and Amedraa.  Divens continued to transfer the FNMA Series CMO to

---

[34] Further, it is undisputed that JDA breached the March 2009 Agreement, thereby
giving rise to LNJ's right to recall the FNMA Series CMO.  LNJ recalled the
FNMA Series CMO on April 14, 2009, but Divens and JDA failed to respond to
LNJ's demands for the CMO.

different financial institutions so as to hide the asset.  In total, Divens transferred the FNMA Series CMO to six different accounts from February 2009 to October 2009.  Divens also continued to transfer interest earned on the FNMA Series CMO out of the accounts where the CMO was held and used such interest for his personal needs.  Neither LNJ nor Amedraa knew of or consented to any of the transfers.

In sum, Amedraa has proven: (1) that at all relevant times it owned the FNMA Series CMO and had the absolute right to possess the interest payments generated from the CMO; (2) that JDA held the interest payments earned on the FNMA Series CMO in trust for LNJ (on behalf of Amedraa) and not for its own benefit; (3) that JDA and Divens refused to turn over the interest payments earned on the FNMA Series CMO to LNJ despite numerous demands from both LNJ and Amedraa; (4) that JDA and Divens, without Amedraa's consent, transferred the FNMA Series CMO to several different financial accounts so as to hide the asset; and (5) that Divens misappropriated the interest income for his personal benefit.  On the basis of these facts, JDA and Divens are liable in conversion.

### b.   Relief

As a general rule, the normal measure of damages for conversion is "'[t]he value of the property at the time of the conversion' and 'a fair compensation for the time and money properly expended in pursuit of the property.'"  <u>Virtanen v. O'Connell</u>, 140 Cal. App. 4th 688, 708 (Ct. App. 2006).  Alternatively, the court may impose a constructive trust on the money or property unlawfully converted by defendant, compelling the defendant to transfer the property to the rightful owner.  <u>Burlesci</u>, 68 Cal. App. 4th at 1069.  Here, because Divens returned the FNMA Series CMO to Amedraa in March 2010, Amedraa requests only that the Court award it the interest income earned on the FNMA Series CMO while it was in JDA and Divens's possession.

From January 2009 through October 2009, the FNMA Series CMO generated a total of $157,444.40 in interest income.  Divens admits that he withdrew all of the interest income earned on the CMO through October 2009 and spent it on his personal needs.  Thus, the proper measure of damages for this period is $157,444.40.  The interest income earned on the FNMA Series CMO from November 2009 through March 2010

(when the CMO was returned to Amedraa) is currently held in the CISC Account.  The parties have stipulated that 31% of the funds currently held in the CISC Account are attributable to interest earned on the FNMA Series CMO.  Thus, the Court will order CISC to distribute 31% of the funds in the CISC Account to Amedraa.

### c.   Divens's Personal Liability

The Court finds that both JDA and Divens are jointly and severally liable for converting the interest income earned on the FNMA Series CMO.  While LNJ entrusted the FNMA Series CMO to JDA, and not to Divens personally, Divens actively participated in and directed the acts of conversion.  As such he is liable in tort.

It is well established that "[a] corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." Accuimage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (quoting Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 734 (9th Cir. 1999) (corporate officers cannot "hide behind the corporation where [the officer is] an actual participant in the tort")); Swingless Golf Club Corp. v. Taylor, 679 F. Supp. 2d 1060, 1069 (N.D. Cal. 2009) ("The law is clear . . . that [d]irectors or officers of a corporation [can] incur personal liability for the torts of the corporation . . . *[if] they participate in the wrong or authorize or direct that it be done*.") (internal citations omitted) (alterations and emphasis in original); Woodworking Enters., Inc. v. Baird, 114 B.R. 198, 204 (9th Cir. Bk. App. Panel 1990) (same); Michaelis v. Benavides, 61 Cal. App. 4th 681, 686 (Ct. App. 1998) (same).  This principle applies regardless of the piercing of the corporate veil.  Woodworking Enters., 114 B.R. at 204 (citing In re Interstate Agency, Inc., 760 F.2d 121, 125 (6th Cir. 1985)).

Here, the evidence is overwhelming that Divens personally directed the conversion of the FNMA Series CMO and benefitted directly therefrom.  JDA is a limited liability company organized under Nevada law.  Jon Divens is the sole member of JDA.  Divens personally conducted all of the discussions and negotiations with Savor regarding the FNMA Series CMO.  Divens controlled all of the accounts in JDA's

name in which the FNMA Series CMO was held.  Divens admitted that he was the only person authorized to conduct business on behalf of JDA.

Divens directed the specific acts of conversion.  Divens testified that he received several demands from Savor, Harris, and Evelyn Amedraa that the FNMA Series CMO be returned to LNJ.  In response to these demands, Divens lied to Savor and told him that the FNMA Series CMO had already been entered into trade, when in fact the CMO was never successfully entered into any trade programs.  Divens then authorized the transfer of the FNMA Series CMO out of the JDA UBS Account in which it was originally held to five different financial institutions so that LNJ could not locate the CMO.  From January 2009 to October 2009, Divens personally gave instructions to the securities intermediaries managing these accounts to transfer the interest income generated by the FNMA Series CMO into JDA's Bank of America business account. Divens used all of this interest income for his own personal needs. On this record, Divens is personally liable for conversion of the FNMA Series CMO.  See, e.g., Montclair United Soccer Club v. Count Me In Corp., Case No. C08-1642-JCC, 2010 WL 2376229 (W.D. Wash., June 9, 2010) (where corporation hired by plaintiff to process payments from plaintiff's clients and remit them to plaintiff instead used the payments to pay its own operating expenses, defendant director who approved and authorized the use of the funds was personally liable for conversion); Stan Lee Trading, Inc. v. Holtz, 649 F. Supp. 577, 581 (C.D. Cal. 1986) (where defendant director was the only officer or director participating in the corporation's management at the time of the unlawful conversion, defendant must have directed the conversion and was therefore personally liable).

**D.  CISC's Attorneys' Fees**

The final issue the Court must address is which party (or parties) should be responsible for the attorneys' fees incurred by CISC in connection with the interpleader action.  On June 10, 2010, the Court awarded CISC $24,834.90 in attorneys' fees, to be paid from the interpleaded funds in the CISC Account.  As stated above, 69% of the funds in the CISC Account are attributable to interest income generated by the Cobalt CMO, which belongs to Betts and Gambles, and 31% of the funds in the CISC Account are attributable to interest income generated

by the FNMA Series CMO, which belongs to Amedraa.  Thus, by awarding CISC's attorneys' fees from the interpleaded funds, in effect, Betts and Gambles and Amedraa have been made to pay for such fees.  Betts and Gambles requests that the Court order JDA,[35] as the losing claimant in the interpleader action, to reimburse Betts and Gambles (and presumably Amedraa) for the attorneys' fees paid from the interpleaded funds.  For the reasons stated below, the Court grants this request.

In an interpleader action, the Court has discretion to assess the plaintiff-in-interpleader's attorneys' fees against the fund payable to the winning claimant(s), against the losing claimant, or between all of the claimants.  Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d 188, 195 (9th Cir. 1962).  The prevailing approach in most cases is to tax the plaintiff-in-interpleader's fees against the losing claimant.  Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 7 Federal Practice & Procedure § 1719 (3d ed. 2010 update) ("[I]n the normal case, [fees] will be taxed against the losing claimant . . ."); see, e.g., Globe Indemnity Co. v. Puget Sound Co., 154 F.2d 249, 250-51 (2d Cir. 1946); Porter Development, LLC v. First Nat'l Bank of Valparaiso, 866 N.E. 2d 775, 780 (Ind. 2007) (collecting cases).  The reason for this rule is that, in most cases, it is the assertion of the losing claimant's claim that necessitates the interpleader and thereby prevents the successful claimant[s] form obtaining the fund undiminished by the interpleaded costs.  Globe Indemnity Co., 154 F.2d at 250.

Certainly, that rationale applies here.  JDA's wholly unfounded claims to the interest earned on the Cobalt CMO and the FNMA Series CMO necessitated this interpleader action.  The Court cannot find any reason why Betts and Gambles's and Amedraa's recovery should be diminished by the fees necessary to resolve this dispute in their favor.  Thus, the Court orders JDA to reimburse Betts and Gambles and Amedraa in the amount of 69% and 31%, respectively, of the attorneys' fees paid to CISC from the interpleaded funds.

///

---

[35] As stated above, Divens personally did not make any claim to the interest income generated by the CMOs.  The interest income was held in securities accounts in the name of JDA; thus, JDA claimed to be entitled to such interest due to its status as an entitlement holder.

**IV. CONCLUSION AND JUDGMENT**

For the reasons stated above, the Court ORDERS, ADJUDGES AND DECREES as follows:

Regarding the interpleaded funds currently held in the CISC Account (which do not include the $24,834.90 already paid to CISC for its attorney's fees), Chase Investment Services Corporation (CISC) is hereby ordered to disburse 69% of the funds to Betts and Gambles Investments, Inc. and its affiliate Betts and Gambles Global Equities (collectively, "Betts and Gambles"). CISC is ordered to disburse the remaining 31% of the funds in the CISC Account to Amedraa LLC.

Judgment on Betts and Gambles's crossclaim for money had and received is entered in favor of Betts and Gambles and against Jon A. Divens in the amount of $241,980.43.

Judgment on Amedraa LLC's crossclaim for conversion is entered in favor of Amedraa LLC and against Jon A. Divens and the Law Offices of Jon Divens and Associates (JDA), jointly and severally, in the amount of $157,444.40.

The Court orders that CISC's attorneys' fees incurred in this interpleader action should be taxed against the losing claimant, JDA. The Court hereby orders JDA to reimburse Betts and Gambles for the portion of CISC's attorneys' fees that were attributable to the interest earned on the Cobalt CMO, in the amount of $17,136.08 (69 percent of the $24,834.90 attorney fee award = $17,136.08)). The Court further orders JDA to reimburse Amedraa LLC for the portion of CISC's attorneys' fees that were attributable to the interest earned on the Cobalt CMO, in the amount of $7,698.82 (31 percent of the $24,834.90 attorney fee award = $7,698.81). Judgment is entered against JDA and in favor of Betts and Gambles and Amedraa, respectively, in these amounts.

IT IS SO ORDERED.

DATED:   October 14, 2010

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE